UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**PETITION FOR A WRIT OF HABEAS CORPUS; 28 USC § 2254**

EVIDENTIARY HEARING REQUESTED

Case No._____

PETITIONER,

**EDWARD H. LYNCH JR.,**
Prisoner Number W 58057

Place of Confinement:
Massachusetts Correctional Institution,
Souza-Baranowski Correctional Center
P.O Box 8000
Shirley, MA 01464
**v.**
RESPONDENTS,

**EDWARD FICCO, Superintendent,**
Massachusetts Correctional Institution,
Souza-Baranowski Correctional Center
P.O Box 8000
Shirley, MA 01464
and,
**The Attorney General of the State of Massachusetts, Thomas Reilly.**

## PETITION

1.  Name and location of court which entered the judgment of conviction under attack:  Plymouth Superior Court, 72 Belmont Street, Brockton, MA  02301.

2.  Date of judgment of conviction:  February 23, 1995.

3.  Length of sentence:  life sentence.

4.  Nature of offense involved:  first-degree murder.

5.  Pleas?  Not guilty.

6.  Kind of trial:  Jury.

7. Did you testify at the trial?  Yes.

8. Did you appeal from the judgment of conviction?  Yes.

9. (a)  Name of court:  Supreme Judicial Court of Massachusetts (SJC).
9. (b)  Result:  Judgments affirmed.
9. (c)  Date of result:  June 12, 2003.

9. (d)  Grounds raised:

(Issues first raised in motion for new trial, and then in direct appeal.)

1.    Failure of defense counsel to call one or more witnesses in the Motion To Suppress hearing who would have bolstered the testimony of defendant's two lay witnesses, would have provided stronger evidence for defendant's expert pharmacologist on which to base his opinion concerning the involuntary aspect of defendant's custodial statements, and would have helped defendant to suppress those statements used against him at trial.

2.    Failure of defense counsel to call one or more of those same witnesses at trial, where their testimony would have been benefited defendant to refute the trial testimony of police officers on the circumstances surrounding defendant's arrest and interrogation and to provide stronger, credible evidence (in addition to testimony from the same two lay witnesses and defendant) for defendant's expert pharmacologist to base his opinion on whether defendant's custodial statements were voluntary. In addition, diminution of the officers' credibility would have increased defendant's credibility in general, and in particular on his testimony concerning his struggle with the decedent, Andrea Geremia, and his testimony conflicting with police officers' and Steven Moosick's, thereby enhancing his self-defense and negation of malice theories.

3.    The "memorial" buttons, showing a rose and the words, "Let Justice Be Served. In Memory of Andrea Rose Geremia" worn by decedent Geremia's family members in the courthouse constituted an extraneous

2

influence and unduly prejudiced the jury. A post-verdict inquiry is warranted.

    4.    Defense counsel's failure to object to prosecution witness Steven Moosick's wearing sunglasses during his testimony interfered with the defendant's "face-to-face" confrontation rights under art. 12 of the Massachusetts Declaration of Rights, and cognate confrontation rights under the Sixth and Fourteenth Amendments of the United States Constitution.

    5.    Defense counsel failed to object, move to strike, or seek limiting instruction on prosecutor's questions to, and resulting unduly prejudicial and inadmissible answers from, defendant's expert pharmacologist about defendant's answers made to a Salvation Army "Global Goals Treatment Sheet" survey in 1986, six years before the June 1992 incident between Geremia and the defendant. Defense counsel also failed to object, or seek limiting instruction on the prosecutor's closing argument on that subject. Defense counsel agrees that failure to object was a mistake.

    6.    During direct examination of defendant at trial, his defense counsel used himself as a stand-in for decedent Geremia, for a demonstration (reenactment) so that defendant could show the jury how he struggled with Geremia. Defense counsel is at least a foot taller than Geremia, thus making it physically awkward for defendant to accurately demonstrate. This permitted the prosecutor to have the defendant make the same physically awkward demonstration using the prosecutor as a stand-in, thus permitting the prosecutor to remark adversely upon the physical awkwardness in closing argument for the purpose of diminishing defendant's credibility and his self-defense theory. The in-court reenactment was not sufficiently pre-tested so that it would not backfire on counsel or his client.

    7.    The court erred in denying defendant's Motion for Funds on issues raised in his Motion for New Trial.

3

(Issues Raised Solely on Direct Appeal.)

8.    The trial judge erred when he interspersed correct instructions on mitigating circumstances, which would reduce defendant's culpability for his acts from murder to voluntary manslaughter, with instructions on voluntary manslaughter as if it were a charged crime, thereby confusing and misleading the jury on the focus and burden of proof on this question.

9.    Consideration of the above-discussed errors, either singly or combined, together with the mitigating factors shown in the record, makes this an appropriate case for the Court to use its G.L. c. 278,§.33E powers to reduce the verdict or order a new trial.

9. (e)  As the Supreme Judicial Court (SJC) is the highest court in the state, no application for further appellate review could be made to a higher state court. Petitioner, however, timely filed a petition for rehearing with the SJC , which was denied on July 23, 2003.

9. (f) Petition for Writ of Certiorari was filed in the U.S. Supreme Court by petitioner on October 3, 2003, was placed on the docket October 7, 2003 as No. 03-6782, and was denied on October 6, 2003.

10.    Motions filed in state court: Yes.

11.

a) (1) Name of Court: Plymouth Superior Court.

2) Nature of Proceeding: Motion for New Trial (including addendum), Mass. R. Crim. P. 30(b), with request for evidentiary hearing. Motions for funds were also filed in conjunction with, and related to, the new trial motion.

3) Grounds raised in Motion for New Trial:

1.    Failure of defense counsel to call one or more witnesses in the Motion To Suppress hearing who would have bolstered the testimony

4

of defendant's two lay witnesses, would have provided stronger evidence for defendant's expert pharmacologist on which to base his opinion concerning the involuntary aspect of defendant's custodial statements, and would have helped defendant to suppress those statements used against him at trial.

2.    Failure of defense counsel to call one or more of those same witnesses at trial, where their testimony would have been benefited defendant to refute the trial testimony of police officers on the circumstances surrounding defendant's arrest and interrogation and to provide stronger, credible evidence (in addition to testimony from the same two lay witnesses and defendant) for defendant's expert pharmacologist to base his opinion on whether defendant's custodial statements were voluntary. In addition, diminution of the officers' credibility would have increased defendant's credibility in general, and in particular on his testimony concerning his struggle with the decedent, Andrea Geremia, and his testimony conflicting with police officers' and Steven Moosick's, thereby enhancing his self-defense and negation of malice theories.

3.    The "memorial" buttons, showing a rose and the words, "Let Justice Be Served. In Memory of Andrea Rose Geremia" worn by decedent Geremia's family members in the courthouse constituted an extraneous influence and unduly prejudiced the jury. A post-verdict inquiry is warranted.

4.    Defense counsel's failure to object to prosecution witness Steven Moosick's wearing sunglasses during his testimony interfered with the defendant's "face-to-face" confrontation rights under art. 12 of the Massachusetts Declaration of Rights, and cognate confrontation rights under the Sixth and Fourteenth Amendments of the United States Constitution.

5.    Defense counsel failed to object, move to strike, or seek limiting instruction on prosecutor's questions to, and resulting unduly

5

prejudicial and inadmissible answers from, defendant's expert pharmacologist about defendant's answers made to a Salvation Army "Global Goals Treatment Sheet" survey in 1986, six years before the June 1992 incident between Geremia and the defendant. Defense counsel also failed to object, or seek limiting instruction on the prosecutor's closing argument on that subject. Defense counsel agrees that failure to object was a mistake.

6.     During direct examination of defendant at trial, his defense counsel used himself as a stand-in for decedent Geremia, for a demonstration (reenactment) so that defendant could show the jury how he struggled with Geremia. Defense counsel is at least a foot taller than Geremia, thus making it physically awkward for defendant to accurately demonstrate. This permitted the prosecutor to have the defendant make the same physically awkward demonstration using the prosecutor as a stand-in, thus permitting the prosecutor to remark adversely upon the physical awkwardness in closing argument for the purpose of diminishing defendant's credibility and his self-defense theory. The in-court reenactment was not sufficiently pre-tested so that it would not backfire on counsel or his client.

7.     The defendant's Motion for Funds were also submitted to the court in conjunction with issues raised in his Motion for New Trial.

11. (a) (4) Petitioner did not receive an evidentiary hearing on the motion.

11. (a) (5) Result: Motions denied.

11. (a) (6) Date of Result:  April 11, 2000. After remand by the SJC to reconsider in light of amended rules on motion for funds, denied by order dated August 7, 2002.

11. (b) Appeal from denial of motions consolidated with direct appeal to the SJC. See above 9 (a)-9 (e).

11. (c)  See above 9 (a)-9 (e).

12.   Concise statement of every ground on which petitioner claims he is being held unlawfully.

Please note that the STATEMENT OF FACTS AND GROUNDS, pages 11-38 *ante*, incorporated herein by reference, support the following grounds.

**A.  Ground one**:  Given that malice was an element of murder, and the trial judge told the jury that all instructions were equally important, the state court violated federal due process by allowing the murder conviction even though several renditions of irreconcilable instructions regarding factors negating malice effectively relieved the Commonwealth of the burden of proving malice beyond a reasonable doubt. (Direct appeal, issue no. 8, page 4 *ante*.)

**B.  Ground two**:  Petitioner was deprived of effective assistance of counsel when his counsel failed to call one or more witnesses in the Motion To Suppress hearing who would have bolstered the testimony of defendant's two lay witnesses, would have provided stronger evidence for defendant's expert pharmacologist on which to base his opinion concerning the involuntary aspect of defendant's custodial statements, and would have helped defendant to suppress those statements used against him at trial. (Direct appeal, issue no. 1, page 2 *ante*.)

**C.  Ground three**:  Petitioner was deprived of effective assistance of counsel to call one or more of those same witnesses at trial, where their testimony would have been benefited defendant to refute the trial testimony of police officers on the circumstances surrounding defendant's arrest and interrogation and to provide stronger, credible evidence (in addition to testimony from the same two lay witnesses and

7

defendant) for defendant's expert pharmacologist to base his opinion on whether defendant's custodial statements were voluntary. In addition, diminution of the officers' credibility would have increased defendant's credibility in general, and in particular on his testimony concerning his struggle with the decedent, Andrea Geremia, and his testimony conflicting with police officers' and Steven Moosick's, thereby enhancing his self-defense and negation of malice theories. (Direct appeal, issue no. 2, page 2 *ante*).

**D.  Ground four**:  Petitioner was deprived of effective assistance of counsel when his counsel failed to pre-test and rehearse the in-court reenactment, during which counsel used himself as a stand-in for the decedent, Geremia, so that it would not backfire on counsel or his client. The hoped-for purpose of reenactment was to have defendant show the jury how he struggled with Geremia. Defense counsel is at least a foot taller than Geremia, thus making it physically awkward for defendant to accurately demonstrate. This permitted the prosecutor to have the defendant make the same physically awkward demonstration using the prosecutor as a stand-in, thus permitting the prosecutor to remark adversely upon the physical awkwardness in closing argument for the purpose of diminishing defendant's credibility and his self-defense theory. (Direct appeal, issue no. 6, page 3 *ante*.)

13.    All of grounds listed in 12 A-D inclusive were previously presented to the state courts.

14.    The petitioner does not have a pending petition for Writ of Certiorari to the Supreme Court of the United States.

15.    Names and addresses of attorneys who represented petitioner in stages of judgment attacked herein:

The same attorneys at (a) preliminary hearing, (b) arraignment and plea, (c) trial, and (d) sentencing:  Oliver C. Mitchell Jr. and Diane Rubin, both were at Goldstein & Manello, P.C., 265 Franklin Street, Boston, MA 02110.

(e) On appeal:  Emanuel Howard, Esq., P.O Box 66067, Newton, MA  02466-0002.

(f) In any post-conviction proceeding:  Same as in 15 (e).

(g) On appeal from adverse ruling in post- conviction proceeding: Same as in 15 (e).

16.    The petitioner was not sentenced on more than one indictment in the same court and the same time.

17.    The petitioner does not have any future sentence to serve after he completes the sentences imposed by the judgment under attack.

WHEREFORE, petitioner Edward H. Lynch Jr. prays:

A.    The Court issue a writ of habeas corpus, on one or more grounds or on the cumulative effect of two or more grounds, to have petitioner brought before the Court to the end that he may be discharged from his unconstitutional conviction, confinement and restraint;

B.    The Court require respondents to bring forward the entire record of the state court proceedings, including the transcript of the trial, the record on appeal, other relevant records in the case, and to specify any proceeding in the case that has been reported but not transcribed;

C.    The Court require respondents to file an answer admitting or denying every factual allegation herein;

D.    The Court permit petitioner to respond to any affirmative defense raised by respondents in his answer;

E.    The court allow petitioner, who is indigent, to proceed without prepayment of costs and fees;

F.    The Court allow petitioner to conduct discovery and to expand the record relating to issues raised by this petition;

G.    The Court allow indigent petitioner funds to obtain expert, investigative, and other services necessary for adequate representation in this matter;

H.    The Court conduct a hearing at which proof may be offered concerning the allegations in this petition that respondent does not admit;

I.    The Court allow petitioner sufficient time to brief the issues of law raised by this petition;

J.    The Court, if it concludes that state remedies with regard to any claim in the petition have not been properly exhausted, should hold the petition in abeyance pending exhaustion of state remedies; and

K.    The Court grant petitioner such other and further appropriate relief to which he may be entitled in this proceeding.

_____
Signature of Attorney: EMANUEL HOWARD

I declare under the penalty of perjury that the foregoing is true and correct. Executed on

3-5-04 _____    _____ Petitioner
            EDWARD H. LYNCH JR.

10

## STATEMENT OF FACTS AND GROUNDS.[1]

### Proceedings at trial.

Petitioner was tried for first-degree murder of Andrea Geremia [G. L. c. 265, § 1], and convicted on two theories: murder with deliberate premeditation, and murder with extreme atrocity or cruelty.

### Evidence at trial.

Lynch first met decedent, Andrea Rose Geremia (Geremia), at a Taunton, Massachusetts bar on June 6, 1992 during his June 5-6 weekend drinking "bender" [6/140, 143-157]. After she and he exchanged promises of sex for $50.00, they went by taxicab that afternoon to his cottage on a pig farm in Lakeville, Massachusetts where he had been working since August 1991 [6/147-163]. Geremia and Lynch had a friendly conversation while in the taxicab and, upon arrival at the road leading uphill to the farm, Lynch asked the taxicab driver to stop and let them out. After some talk, Lynch asked the driver to take them up to his cottage. Geremia told the driver that she would call in about thirty minutes [2/154-155, 158, 165-166].

Lynch took the witness stand and recounted what happened next. Only Geremia and he were in the cottage at that time. Once in the cottage, he and Geremia conversed. He drank some more, gave Geremia a soft drink, gave her a shirt to wear against the chill, gave her the $50.00 he took from a bureau drawer where he kept his cash, saw her put the cash under her T-shirt, passed out before sex could be consummated, awoke to the sound of the bureau drawer being closed, saw Geremia "heading towards the kitchen with her hand down her front," concluded that she had taken the rest of his cash, followed her into the kitchen, saw her with his kitchen boning knife in her hand pointed at him, while saying to him, "stay away or I'll cut you, or stick

---

[1] References to trial transcripts will be [vol. #/page#]; those to the appendix filed with petitioner's brief to the SJC will be [A.#]; and those to the appendix filed with his supplemental brief will be [S.A.#].

you or something to that effect [6/164-173]." Defendant approached; he asked for his knife and money. She lunged forward. Geremia kneed defendant in the groin, causing him to go down on one knee. He grabbed hold of her right arm, struggled with her, and tried to keep the knife away from him. During the struggle, he became aware that she sustained a stab wound [6/173-176].[2] Geremia died in the kitchen. Lynch cleaned up and buried her the next day, using a front-end loader to place her into a long trench used as a pig grave. He remained at work for eight more days. He then placed his belongings in the farm owner's pick-up truck and drove away in it [6/179-187; 3/106-107].

Geremia's family filed a missing person's report on June 9 [2/115]. Police investigation led to the taxicab driver, and then to Mr. Lynch.[3] Geremia's whereabouts remained unknown to the police until, on information obtained from a volunteer informant, the Massachusetts State Police used a back hoe to unearth her on January 4, 1993. The information came from a just released inmate from the Plymouth (Massachusetts) House of Correction who repeated what he was told by another inmate, Steven Moosick. Moosick and Lynch were fellow inmates in that institution; Lynch confided in Moosick while the former was then serving a six month sentence there [3/144, 147-153; 4/92-96, 101].

Lynch had been released from the incarceration by the time he was arrested on January 4, 1993. Massachusetts state police officers found him about 9:30 p.m., sleeping on the floor of the Brockton, Massachusetts apartment of two drinking friends, Patricia MacDonald

---

[2] Evidence showed five "fatal" stab wounds in Geremia's thoracic-abdominal area (plus non-fatal thigh and buttock wounds) [5/225-235, 239-240]. The prosecutor contended that defendant had the knife in his hand while inflicting all seven stab wounds.

[3] He was in the Bristol (Massachusetts) House of Correction when the police questioned him there on June 23 and on July 30, 1992. Neither the questioning nor other police investigation revealed her whereabouts [3/87-101, 106-107, 126-131, 136-143].

(Pat) and Donald Podzka (Don) [5/133-137]. This was after Lynch, Pat and Don had been in the apartment on a seventeen day drinking binge, consuming large quantities of vodka and beer through the 1992-1993 Christmas-New Year period up to and including the day of his arrest [6/74-83, 105-110]. According to Massachusetts state police Sgt. Loud at trial, Lynch told her during the ensuing post-arrest interrogation that: Geremia grabbed the knife; he then grabbed the knife from her and stabbed her; he used his right hand and stabbed her in the stomach on the right side. The question of who held the knife during the stabbing was hotly contested at trial; suppression of, and related issues on, petitioner's alleged custodial statements to Sgt. Loud thereon were the subjects of pretrial and post trial motions and appeals.

## REASONS FOR GRANTING THE WRIT

**A.  Ground one**:  Given that malice was an element of murder, and the trial judge told the jury that all instructions were equally important, the state court violated federal due process by allowing the murder conviction even though several renditions of irreconcilable instructions regarding factors negating malice effectively relieved the Commonwealth of the burden of proving malice beyond a reasonable doubt.

### A.  Introduction.

Based upon petitioner's testimony about the events leading up to and including his struggle with Geremia and her death [6/164-176], the evidence "would permit a verdict of manslaughter rather than murder, [requiring that] a manslaughter charge should be given." *Commonwealth v. Brooks*, 422 Mass. 574, 578, 664N.E.2d 801, 805 (1996), quoted in *Commonwealth v. Little*, 431 Mass. 782, 785-786, 730 N.E.2d 304, 307-308 (2000).[4] As will be seen in the discussion below, "[m]alice, in the

---

[4] Both *Commonwealth v. Brooks* and *Commonwealth v. Little* cite the authority of *Commonwealth v. Walden*, 380 Mass. 724, 726-727, 405 N.E.2d 939 (1980).

sense of the absence of provocation, was part of the definition of the crime [of murder]." *Patterson v. New York*, 432 U.S. 197, 216 (1977). But contrary to the requirements of *Mullaney v. Wilbur*, 421 U.S. 684, 697-698, 704 (1975), the trial judge's instructions frequently inverted the burden on the Commonwealth to prove the absence of mitigating factors negating malice.[5] These inversions were, in turn, "contrary to the Due Process Clause as construed in [In re] Winship [, 397 U.S. 358, 364 (1970)]." *Id.*[6] In the context of all of the instructions, they "created the significant possibility that the [petitioner] was erroneously convicted of murder in the first degree instead of manslaughter." *Commonwealth v. Boucher*, 403 Mass. 659, 663, 532 N.E.2d 37, 39 (1989).

## B. The law in Massachusetts on murder and mitigating factors negating malice.

### (1) Statutes on murder and manslaughter.

At the time of the trial, a Massachusetts statute defined murder, in pertinent part, as follows:

> Murder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty ..., is murder in the first degree. Murder which does not appear to be in the first degree is murder in the second degree. ... The degree of murder

---

[5] For purposes of this petition, an inversion is a misstatement of the law and occurs whenever the trial judge instructs and gives the jury the idea that the law requires the Commonwealth to prove mitigating factors, e. g., heat of passion as a result of reasonable provocation or on sudden combat beyond a reasonable doubt, rather than to prove the <u>absence</u> of the mitigating factors beyond a reasonable doubt. In part C, *post*, petitioner sets forth at least seven instances of inversion.

[6] "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship, supra*, 364.

shall be found by the jury. G.L. c.265, § 1.

At the same time, another statute provided punishment for committing manslaughter, but did not define it (G.L. c. 265, §13; see *ante*, at 3).[7] As a result, the following needed to be developed by case law: the definitions for malice and manslaughter; the principle that the crime is manslaughter, and not murder, if malice is negated by mitigating circumstances, e. g., heat of passion as a result of reasonable provocation or on sudden combat; and the proper placement of the burdens of production and proof on mitigating circumstances.

(2) The three prongs of malice, as an element of murder.

Massachusetts case law delineated three prongs of malice for the first-degree murder theories (deliberate premeditation, and extreme atrocity or cruelty) upon which petitioner was tried and convicted.

> Malice as an element of murder may be proved by evidence establishing any one of three facts beyond a reasonable doubt: if, without justification or excuse, (1) the defendant intended to kill the victim (the so-called first prong of malice), or (2) the defendant intended to do the victim grievous bodily harm (the second prong), or (3) in the circumstances known to the defendant, a reasonably prudent person would have known that, according to common experience, there was a plain and strong likelihood that death would follow the contemplated act (the third prong).

*Commonwealth v. Snead*, 413 Mass. 387, n.1, 597 N.E. 2d 1346, 1347 n.1 (1992), citing *Commonwealth v. Grey*, 399 Mass. 469, 470 n. 1, 505 N.E.2d 171 (1987).

> (3) When there is evidence of mitigating factors, e.g., provocation or sudden combat, that might reduce the crime of murder to manslaughter, the state has the burden of proving beyond a reasonable doubt that defendant did not act in the heat of passion.

---

[7] G.L. c. 265, § 2 provided the death penalty or imprisonment for life as punishment for murder, but the death penalty was declared unconstitutional. *Commonwealth v. Cruz*, 393 Mass. 150, 470 N.E. 2d 116 (1984); *District Attorney for the Suffolk District v. Watson*, 381 Mass. 648, 411 N.E. 2d 1274 (1980).

15

a) "[T]he crime is voluntary manslaughter not murder, if malice is negated by reasonable provocation or sudden combat (or at least by a reasonable doubt that those conditions were absent)." *Commonwealth v. Boucher, supra*, 403 Mass. 661, 532 N.E. 2d 39. Without malice, an unlawful killing can be no more than manslaughter. *Commonwealth v. Judge*, 420 Mass. 433, 437, 650 N.E. 2d 1242 (1995) (citations omitted).

b) "[I]t is well established that if any view of the evidence in a case would permit a finding of manslaughter rather than murder, a manslaughter charge should be given." *Commonwealth v. Cyr*, 425 Mass. 89, 97, 679 N.E. 2d 550, 556 (1997), quoting *Commonwealth v. Walden, supra*, and citing additional authorities.

c) When there is evidence of factors, e. g. provocation, that might reduce the crime to manslaughter, the Commonwealth has the burden of proving beyond a reasonable doubt, <u>that defendant did not act in the heat of passion</u>. *Commonwealth v. Greene*, 372 Mass 517, 519, 262 N.E. 2d 910, 911 (1977); *Commonwealth v. Johnson*, 372 Mass. 185, 192, 361 N.E. 2d 212, 216 (1977). "The correct rule is that, where the evidence raises the possibility that the defendant may have acted on reasonable provocation, the Commonwealth must prove, and the jury must find, beyond a reasonable doubt <u>that the defendant did not act on reasonable provocation</u>." *Commonwealth v. Acevedo*, 427 Mass. 714, 716, 695 N.E. 2d 1065, 1067 (1998) (emphasis supplied, citation omitted).

<u>(4)  The evidence would permit a finding of manslaughter rather than murder.</u>

In the instant case, petitioner testified that when he approached

16

the decedent in his cottage, she had a knife in her hand. She lunged forward to stab him. He grabbed her arm; she kneed him in the groin, causing him to go down on one knee. As he tried to push her away, she tried to swap hands with the knife and also slapped at him [VI/174]. When he first saw her with the knife, he was "scared." He did not know what she was capable of doing and he did not want to be cut. After she was stabbed, he started screaming at her. He could not believe it was happening [VI/176-177]. Trial counsel followed this up by describing what defendant said on the witness stand, and arguing that the defendant was "affected in some way by the behavior of his guest turned intruder [VII/159-161, 167]."

On a reasonable view of the evidence, the jury could then take the behavior of the decedent as a reasonable provocation that would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint. They could take the petitioner's testimony on his emotional and physical reactions to decedent's conduct as evidence that what happened actually did create in him such a state of mind. See *Commonwealth v. Little, supra*, 431 Mass. 786, 730 N.E. 2d 307, quoting *Commonwealth v. Berry*, 431 Mass. 326, 727 N.E. 517 (2000). (quotation marks omitted).[8]

---

[8] At oral argument before the SJC, the Commonwealth admitted that there was sufficient evidence to require a manslaughter instruction pursuant to the above-referenced Massachusetts cases, and also admitted that the trial judge made errors by inverting the burden of proof on this topic.

**C. The trial judge's irreconcilable instructions raise the reasonable likelihood that the jury took them to mean that the Commonwealth had the burden to prove, rather than to disprove, mitigating factors negating malice beyond a reasonable doubt.**

What follows is a summary and comment on the instructions, transcribed in volume 7, that the trial judge gave bearing on murder, mitigating circumstances negating malice, and the burden of proof on the absence of mitigating circumstances.[9]

(**N.B.**: bop = burden of proof;  brd = beyond a reasonable doubt).

(a)  All instructions equally important; do not single out some and ignore others [7/191];

(b)  Jury to accept entire law as it is given by judge [7/192];

(c)  Malice aforethought; three prongs defined [7/227-228];

(d)  Malice is not provocation; **judge will instruct more on voluntary manslaughter** [7/228;

(e)  **"If you find"** (implying that someone must prove the "hot blood" state of mind of the petitioner before malice is not proved) that death results when defendant was in hot blood on reasonable provocation or sudden combat, or use of excessive force in self-defense, then malice is not proved [7/228] **(inversion # 1)**;

(f)  Extreme atrocity or cruelty defined: three elements including malice, plus special factors on extreme atrocity or cruelty [7/232-235;];

(g)  Second degree murder defined, two elements including malice [7/236-238];

(h)  Introduces **manslaughter as "lesser included offenses" – voluntary and involuntary** [7/238-239] **(inversion #2)**;

---

[9] Analysis on the question of whether the petitioner "has been accorded his constitutional rights" in the instructions "requires careful attention to the words actually spoken to the jury." *Sandstrom v. Montana*, 442 U.S. 510, 514 (1979).

(i)  Voluntary **manslaughter** - passions – sudden combat, **what Commonwealth must prove: three elements of manslaughter** [7/239-242] **(inversion # 3)**;

(j)  Now judge says that <u>Commonwealth has bop/brd</u> that defendant <u>did not act in heat of passion</u> [7/242] (correct statement);

(k)  Then judge says <u>Commonwealth has bop/brd that defendant did not act in heat of passion, and jury may not return a verdict of murder unless the Commonwealth meets this burden</u> [7/244] (the "saving" instruction in *Commonwealth v. Fickling*, Section D, *post*, but thereafter followed by several inversions, see below);

(l)  Again judge raises issues of hot blood-passion: if not persuaded brd that intent did not arise in hot blood-passion, **so it's manslaughter if Commonwealth proves elements of that crime brd** [7/245] **(inversion #4)**;

(m)  Judge recaps:  that **Commonwealth must prove brd provocation or sudden combat for it to be voluntary manslaughter** [7/246-247] **(inversion # 5)**;

(o)  The judge's <u>last words</u> on manslaughter [7/250-251], beginning at 7/250, line 23 were these:

"Please remember that the verdict of manslaughter is not a compromise. It is a permissible verdict if, in your judgment, **the facts fit the crime of manslaughter** rather than the crime of murder in the first or second degree **if, in fact, you find the facts support a conviction of any crime at all beyond a reasonable doubt**" (inversion # 6).

Then at 7/251, line 13, "**If you find facts** which come within the definition **of manslaughter** as I have described it **and that those facts have been proved beyond a reasonable doubt,** then you may consider it as a verdict. **If you do not conscientiously find these facts,** <u>then a verdict of guilty of manslaughter is not appropriate</u>" **(inversion # 7)**.

### D. The SJC's decision violated due process, because it effectively relieved the state of the burden of proof beyond a reasonable doubt on the critical question of intent-related malice.

The SJC's decision unconstitutionally permitted conviction on murder instead of manslaughter.

The Commonwealth admitted in oral argument that the evidence in this case was appropriate for instructions on mitigating circumstances negating malice, and conceded that the trial judge gave erroneous instructions on that topic. But it then claimed, and the SJC ruled, that the weight of correct and incorrect instructions in the instant case is within the *Commonwealth v. Fickling*, 434 Mass. 9, 746 N.E. 2d 475 (2001) range, i.e., two correct statements of the law with a "saving statement" attached to the second of these, sandwiched by two misstatements. *Id.* 434 Mass. 19-20, 746 N.E. 2d 483-484. The Commonwealth stated at oral argument, that "if *Fickling* is o.k., then this case is o.k."

*Fickling*, however, (1) did not overrule *Commonwealth v. Boucher* or *Commonwealth v. Acevedo, supra*; (2) did not change the "center of gravity" principle; and (3) did not have the same weight as "correct" versus "inverted" instructions as the instant case where, in addition to making several prior misstatements inverting the burden of proof, the judge also followed the "saving statement" with several inverting misstatements [7/245-251]. Section C, *ante*. If this Court reviews the trial judge's instructions as a whole, it would conclude that the center gravity was strongly on the side of inverted misstatement, where the instructions were internally contradictory and did not make it sufficiently clear to the jury that the Commonwealth had the burden to disprove beyond a reasonable doubt mitigating circumstances negating malice. This deficiency is clearly seen when we consider the judge's introductory instructions. At the outset, he told the jury that

20

[a]ll of my instructions are equally important. Do not single out some and ignore others. You must follow the law as I state it to you, whether you agree with it personally or not [7/191].

The evidence would have supported a finding of both malice and mitigating factors negating malice. But the Commonwealth, of course, would not have had any incentive or desire to offer to prove, or to argue to the jury that it had proved beyond a reasonable doubt that there existed in this case mitigating factors negating malice.

At best, therefore, this Court would have "no way of knowing which of the [several renditions] of irreconcilable instructions the jurors applied in reaching their verdict." *Francis v. Franklin*, 471 U.S. 307, 322 (1985). This uncertainty destroys the confidence in the verdict required by *In re Winship, supra*, 397 U.S. 364, where the prosecution here must prove malice aforethought, an element of the crime of murder, beyond a reasonable doubt. "It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." *Ibid*, as quoted in *Mullaney v. Wilbur, supra*, 421 U.S. 700. The court in *Mullaney* recognized the vital liberty interests arising from the differential in sentencing ranges between a murder and a manslaughter conviction. *Id*. Petitioner, here, faced a similar differential, *i.e.*, ranging from a fine to a mandatory life sentence.

The instructions as a whole leave people in doubt whether the petitioner was erroneously convicted of murder in the first degree instead of manslaughter. The "saving" instruction that the SJC discussed did no more than contradict the preceding incorrect instructions. But then the "saving" instruction was followed by several incorrect and contradictory instructions. A reasonable juror could easily have resolved the contradictions in the instructions by choosing to abide by the last words he heard on the topic and apply the incorrect, inverted instructions. Cf. *Francis v. Franklin, supra*, 471 U.S. 321, n.7 ("certainly reasonable to

21

expect a juror to attempt to make sense of a confusing earlier portion of the instruction by reference to a later portion of the instruction").

Nothing in the instructions as a whole makes clear to a reasonable juror that one (or more) of these contradictory instructions carries more weight than the others, especially where the judge told the jury, "[a]ll of my instructions are equally important. Do not single out some and ignore others [7/191]." He soon follows this by emphasizing that the juror "must accept the entire law that I'm going to give you. That is my first [indispensable or key] instruction that you accept the law as I state it to you [7/192]." Another reasonable juror, therefore, could have easily resolved the contradictions by using the incorrect, inverting instructions to cancel-out the correct ones, thus depriving petitioner of the due process protections set forth in *Mullaney v. Wilbur*, supra 421 U.S. 697-698. Given the circumstances, one cannot discount the possibility that the jury may have interpreted the incorrect instructions in an unconstitutional manner. *Francis v. Franklin, supra,* 471 U.S. 321-324.

Under the rule applied by the SJC, "a defendant can be given a life sentence when evidence indicates that it is as likely as not that he deserves a significantly lesser sentence. This is an intolerable result in a society where, to paraphrase Mr. Justice Harlan, it is far worse to sentence one guilty only of manslaughter as a murderer than to sentence a murderer for the lesser crime of manslaughter. *In re Winship*, 397 U.S., at 372 (concurring opinion)." *Mullaney v. Wilbur, supra,* 421 U.S.703-704.

Here, malice is an intent-related element of the crime of murder. [*Ante* at 8][10] "[T]he Due Process Clause prohibits a state from making use of jury instructions that have the effect of relieving the state of the

---

[10] See *Francis v. Franklin, supra,* 471 U.S. 317, citing *Mullaney v. Wilbur,* supra, 421 U.S. 698-701, where, as here, the issue of mitigating factors negating malice bears on the question of intent.

burden of proof enunciated in *Winship* on the critical question of intent in a criminal prosecution." *Francis v. Franklin, supra,* 471 U.S. 326-327, citing and reaffirming *Sandstrom v. Montana, supra,* 442 U.S. 521. Based upon all of the foregoing, there is a reasonable likelihood that the jury used the irreconcilable instructions in a fundamentally unfair way which relieved the prosecution of the burden of persuasion on an element of the crime. That amounts to reversible error on due process grounds, because the Commonwealth cannot prove beyond a reasonable doubt that the error was harmless. *Estelle v. McGuire,* 502 U.S. 62, 72, n.4 (1991); *Boyde v. California,* 494 U.S. 370, 378 (1990); *Chapman v. California,* 386 U.S. 18, 24 (1967).[11]

### Grounds two, three and four: applicable ineffective assistance of counsel standards.

*Strickland v. Washington,* (*Strickland*) 466 U.S. 668 (1984) states the two-prong test under the Sixth and Fourteenth Amendments to the United States Constitution. First (performance), a "defendant must show that counsel's representation fell below an objective standard of reasonableness," measured, in part, according to prevailing professional norms. *Id.* 687-688. A "reasonably competent attorney" performs "within the range of competence demanded of attorneys in criminal cases," *United States v. Cronic,* 466 U.S. 648, 655 (1984), citing authorities. Second (prejudice), he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability

---

[11] See, also, *Francis v. Franklin, supra,* 323-324, n.7, citing *Stromberg v. California,* 283 U.S. 359 (1931) (well settled law "that when there exists a reasonable possibility that the jury relied on an unconstitutional understanding of the law in reaching a guilty verdict, that verdict must be set aside").

sufficient to undermine confidence in the outcome." *Id.* 694. "The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors. When a defendant challenges a conviction [on grounds of ineffective assistance of counsel], the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland, supra,* 466 U.S. 695.

As regards a claim that evidence was not brought before the jury due to ineffective assistance of counsel, the opinion in *(Terry) Williams v. Taylor,* 529 U.S. 362, (2000) involving a federal habeas corpus petition claiming ineffective assistance, sets further governing standards. It (1) cites A.B.A. standards for counsel's duty to investigate; (2) promotes the need to reweigh both evidence that came in at trial and evidence which did not, in order to determine what effect the latter evidence would have had on the trier of fact (here, as to whether the "factfinder would have had a reasonable doubt respecting guilt."), so that evidence which may sometimes be considered "cumulative" should still be used in the "reweighing" process; (3) mandates acceptance of the reality that, even if "not all of the additional evidence was favorable," evidence which would have helped defendant should have been presented to the fact finder; and (4) does not accept a counsel's "tactical decision" in simply relying upon what was available to him without further investigation as representation within an objective standard of reasonableness. *Id.* 529 U.S. at 394-399. The U.S. Supreme Court has decided that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S., at 690-691.

**B.  Ground two**: Petitioner was deprived of effective assistance of counsel when his counsel failed to call one or more witnesses in the Motion To Suppress hearing who would have bolstered the testimony of defendant's two lay witnesses, would have provided stronger evidence for

24

defendant's expert pharmacologist on which to base his opinion concerning the involuntary aspect of defendant's custodial statements, and would have helped defendant to suppress those statements used against him at trial.

AND

**C. Ground three**:  Petitioner was deprived of effective assistance of counsel to call one or more of those same witnesses at trial, where their testimony would have been benefited defendant to refute the trial testimony of police officers on the circumstances surrounding defendant's arrest and interrogation and to provide stronger, credible evidence (in addition to testimony from the same two lay witnesses and defendant) for defendant's expert pharmacologist to base his opinion on whether defendant's custodial statements were voluntary. In addition, diminution of the officers' credibility would have increased defendant's credibility in general, and in particular on his testimony concerning his struggle with the decedent, Andrea Geremia, and his testimony conflicting with police officers' and Steven Moosick's, thereby enhancing his self-defense and negation of malice theories.

**Grounds two and three:** MISSING EVIDENCE ON CUSTODIAL STATEMENTS: INTRODUCTION.

Grounds two and three concern missing evidence at the 1994 hearings on defendant's Motion to Suppress custodial statements, and at the 1995 trial. Petitioner has gone as far as possible to show that he could produce admissible evidence on this substantial issue at an evidentiary hearing on the new trial motion: (1) through undersigned counsel's affidavit offering what both Kimberly and Dr. Cornelius Kiley would be expected to say at a hearing or trial, while explaining why they would not supply their own affidavits at this time [A. 285-291]; (2) through copies of newspaper articles, attested copies of Wareham District Court records, Dept. of Correction Health Services records [A. 298-322], and Mr. John Hoey's affidavit [A. 327-329]; (3) through motions for funds to depose Kimberly, Dr. Kiley, and others in order to provide sworn testimony in keeping with the offers of proof already submitted, in the event that the trial judge, to whom the new trial motion was referred, did not deem the above material to be adequate [A. 67, 330-357].

25

Petitioner, thus, has met the holding and rationale of
*Commonwealth v. Figueroa*, 422 Mass. 72, 661 N.E. 2d 65 (1996). He has
shown that he <u>would</u> be able to produce witnesses to offer relevant,
admissible evidence, *id.* 78-79, if only given the chance at a deposition or
at an evidentiary hearing. Cf. *Commonwealth v. Truong*, 34 Mass. App.
Ct. 668, 615 N.E. 2d 208 (1993) (although defendant's request for
evidentiary hearing on new trial motion relied on inadmissible hearsay,
those statements are buttressed, as here, by other information and fact
that Commonwealth has produced no counter affidavits). *Id.* 675. The
missing evidence would have made a difference in the outcome.

**GROUND TWO:** MISSING EVIDENCE ON CUSTODIAL STATEMENTS (AT MOTION TO
SUPPRESS HEARING).

Paragraphs 4 and 7 of the defendant's Amended Motion to
Suppress relate to custodial statements he allegedly made to police
officers on the night of his arrest [A. 18-19, 24]. *Commonwealth v.
Freeman,* 430 Mass. 111, 114, 712 N.E. 2d 1135 (1999) (two-fold
inquiry); *Commonwealth v. Paszko*, 391 Mass. 164, 177, 461 N.E. 2d 222
(1984) (statement made by person incapable of withholding information
due to physical or mental impediments cannot be used as evidence
against him). Steadman, J. denied the motion, mainly because he did not
find credible the testimony of Pat and Don, who provided the major basis
for Dr. Lukes' opinion [A. 81-82, pars. 13-17; A. 86, par. 14.]

Motion to Suppress and trial evidence detailed defendant's chronic
alcoholism: his drinking since age 15 and for over 25 years, and
numerous treatments for that condition [A. 125-137; 6/ 128-133]. Dr.
Lukes reviewed defendant's alcohol-related treatment records from
several facilities. He also interviewed Lynch. Dr. Lukes then opined on
the impairment that defendant's drinking had on the voluntariness and
rationality of the custodial statements made to the police between 10:00

p.m. and midnight on January 4. Dr. Lukes based his answers and
opinions on hypothetical facts including Lynch's drinking binge, and
Lynch's passing out sometime around 6-8:00 p.m. on the night of his
arrest after having been drinking [A. 136-159]. [12]

Mr. Lynch told defense counsel about Kimberly, about her visits to
the apartment during the drinking binge period, and what she would
have observed, especially during her visit in the late afternoon of the day
he was arrested, when she saw him drinking [A. 275, par. 2 and
diagram, A. 279]. Defense counsel did not call Kimberly to testify at the
Motion to Suppress hearing or at the trial. Kimberly's testimony for
Lynch at the Motion to Suppress hearing would have been invaluable.
She would have been the only witness, who was not an alcoholic and did
not participate in the binge, who observed him during the binge and just
a few hours before his arrest. She would have provided credible evidence
on: (a) the quantity of drinking during the binge; (b) the disorder and
mess in the apartment compared with the orderly and clean way Lynch
kept another apartment; (c) defendant's being "ossified" and "tired,
drained and scruffy" around 6:00 p.m. on the day of his arrest; (d) and
on observing him drinking at around 6:00 p.m. [A. 285-289, pars. 1-8].[13]

---

[12] Dr. Lukes opined that Lynch would be in the beginning of
detoxification and withdrawal, with possible seizures, observable
jitteriness and shaking, probably very anxious, probably nervous, and
probably with abdominal pain. Lynch's thought process would be
rambling: he would be "unable to choose," and not focus. His judgment
and reasoning would be adversely affected, his memory would be
deteriorating, and he could begin confabulating (mixing fact with fiction).
Lynch's free will and volition would be compromised, and he would be
open to psychological coercion. With all this, one might not be able to see
an unsteady gait or a slurring of speech [A. 136-147].

[13] Here is a comparison of testimony from witnesses on key
aspects: (a) time of police arrival in the Oakland Avenue apartment: Sgt.
Loud: arrived at building at 9:15 p.m., but did not get into the apartment
building until about fifteen minutes later, i. e., 9:30 p.m. [A. 99-100];
Don: early evening after Lynch passed out, which was about an hour

Kimberly would have provided a more credible basis for Dr. Lukes' opinion. Steadman, J. found Pat's and Don's testimony unpersuasive [A. 81, pars. 13-14], not credible [A.86, par. 14], and that Dr. Lukes' opinion was entitled to no weight because

> [Don's and Pat's testimony] was a major basis for Dr. Lukes [sic] opinion. While I find Dr. Lukes qualified to testify in this area, I reject his opinion [A.86, par. 14].

Steadman, J. made a special point that, although Lynch was drinking prior to his arrest, he finds that

> there was a <u>fourteen hour hiatus</u> between his last drink at 8:00 a.m.[sic] on January 4, 1993 and the time of his statement to the

---

before the police arrived [A. 112]; Pat: she was asleep [A. 122]; <u>(b) appearance of apartment</u>: Sgt. Loud: did not notice any alcoholic beverage containers [A. 101-102]; Don: messy appearance inferred from his description of drinking behavior throughout binge [A. 106-115]; Pat: alcoholic beverage containers all over the small living room, and also in kitchen [A. 120, and see diagram A. 279]; <u>(c) drinking on day of arrest and Lynch's last drink</u>: Sgt. Loud: Lynch's last drink was 9:00 a. m., as allegedly told to her by him [A. 98]; Don: "We'd get up in the morning. Start drinking as soon as we got up and continue drinking 'till we passed out or ran out of booze." Immediately before Lynch passed, out he was drinking beer and vodka. Lynch had nothing to eat that day [A. 111, 114, 115]. If the police arrived at the apartment at 9:30 p.m., and if Lynch passed out about an hour before they arrived, and he was drinking up to the time he passed out, his last drink would have been at 8:30 p.m.; Pat: Lynch began drinking at 6:00 -7:00 a.m. and, when she went to bed at about 6:00 p. m., Lynch and Don were still drinking vodka and beer in the living room [A. 119, 121-122]; Lynch testified at trial that police woke him at about 9:00 p.m. and that he had his last drink a couple of hours before he was arrested [6/201]; <u>(d) smell of alcohol on Lynch's breath</u>: Sgt. Loud: even though she came as close to Lynch as "within inches," she did not detect an odor of alcohol from him [A. 104-105]; Don and Pat: inferred from their respective descriptions of Lynch's drinking on that day. State Police Officer Coppenrath testified at trial, consistent with his testimony at the motion hearing, that he detected an odor of alcohol coming from defendant's person while seated two-three feet away from him in the interrogation room at about 10:00 p.m. that night [4/123, 139].

28

police at 10:00 p.m. on January 4, 1994 [A. 86, par. 15, emphasis supplied].[14]

Where Kimberly's testimony would have shortened the "hiatus" to only four hours, the judge could have rationally inferred that Mr. Lynch drank vodka and beer during that interim. With Kimberly's testimony, the judge would have had an easier time believing Don's testimony to the effect that Lynch kept on drinking until he passed out (at about 8:30 p.m. by inference) [A.112-115]. Judge Steadman would have been warranted in concluding that the Commonwealth had not met its burden of proof, and would have been warranted in suppressing the custodial statements, all based upon Pat's, Don's, and Dr. Lukes' testimony enriched by Kimberly's testimony.

There was another unused, but available, source of credible evidence for Dr. Lukes' opinion. Dr. Kiley, a forensic psychologist, observed and evaluated defendant on competence to stand trial, G. L. c.123, §15(a), at his January 5, 1993 murder charge arraignment in Wareham District Court [A. 300-305]. This was between 10:00 a.m. and noon, and between ten and twelve hours after the custodial interrogation had ceased [A. 289, par. 9(a-j)].[15] Dr. Kiley recalls that Lynch looked "hung over," was shaking during the interview, appeared to be in a great deal of discomfort from withdrawal of alcohol, was depressed, had a flat affect, and answered questions in a monotone [A. 289, par. 9(h)]. Dr. Kiley's neutral, professional observations between ten and twelve hours after Lynch's custodial interrogation would have benefited Lynch at the

---

[14] The 8:00 a.m. time for the last drink here, and at A. 80, par. 10, are probably "typos," since the only evidence on that from Sgt. Loud was 9:00 a. m. [A. 98].

[15] Lynch says it was about 11:00 a.m. [A. 276, par. 2].

29

Motion to Suppress hearing. His testimony would have provided Dr. Lukes' additional credible bases for his opinion.[16]

Dr. Kiley's observations between 10:00 a.m. and noon were consistent with Lynch's reporting.[17] Unfortunately, Dr. Kiley refused to give us the benefit of his affidavit on the above, after consulting with some colleagues. He would, however, appear for deposition or hearing to answer questions about his observations if subpoenaed [A. 289, par.9(b)].

Other corroborative evidence. John T. Hoey [A. 327-329], employed by the Enterprise newspaper in Brockton between 1983 and July 1997, covered criminal court proceedings and wrote stories about them. He covered Lynch's arraignment for the instant charges, but had no immediate independent memory thereof. He recalled a few facts about the case while speaking to undersigned counsel on the telephone, and later reviewed a copy of his published story thereon. It was his usual and customary journalistic practice: (1) to make notes of a court proceeding he covered for use in the story he wrote about it; (2) to write the story later that same day, using those notes and; (3) to record the words he heard verbatim as they were being spoken, placing them within quotation marks along with the name of the person who spoke them, if

---

[16] Dr. Kiley's testimony would have also lent credence to Lynch's trial testimony. Lynch testified that he did not feel well during the interrogation and asked for medical assistance, to no avail. The officers said, "we'll see," and so he told the officers "what they wanted to hear," as long as he could hope to receive medical attention. He was confused, scared, suffered from shakes, and was still intoxicated [6/200-205; 7/51]. Lynch saw Attorney Fagan and Dr. Kiley in the court's holding cell; he asked each of them to arrange for him to receive medical attention [A.276, par. 2]. He received medical attention and medications later that day at Bridgewater State Hospital [A. 311-316].

[17] Dr. Kiley's observations are also consistent with Dr. Lukes' answers, on cross-examination, regarding what Lynch's symptoms would have been January 4 between 10:00 p.m. and midnight had he stopped drinking about twelve hours before the custodial interrogation, i. e., "full blown withdrawal symptomology [A.156-159]."

he wanted to use them as quotations for the story. Based upon these practices, and on reviewing his story, he is able to say with a very high degree of confidence that his story is accurate and that words in the story within quotation marks were the actual words he heard spoken and recorded in court that day by the speaker to whom he attributed them, e. g., A.D.A. Frank Middleton, Dr. Kiley, and Mr. Lynch's attorney for the arraignment. Mr. Hoey quotes Dr. Kiley as telling the arraignment judge that Mr. Lynch "was in a great deal of discomfort from withdrawal of alcohol [A. 327-329]."[18] Because Kimberly and Dr. Kiley have declined to give their own affidavits, Mr. Hoey's evidence is proffered to bolster defendant's supporting materials. It is offered to show what was said at the arraignment, to explain why certain things were done, and also because it tends to impeach Sgt. Loud. Mr. Hoey's statements come under the combined principles of business routine, *Commonwealth v. Carroll*, 360 Mass. 580, 587, 276 N.E. 2d 705 (1971); *O'Connor v. Smithkline Bioscience Labs. Inc.*, 36 Mass. App. Ct. 360, 365, 631 N.E. 2d 1018 (1994), and past recollection recorded, *Commonwealth v. Galvin*, 27 Mass. App. Ct. 150, 151-153, 535 N.E. 2d 623 (1989); see generally, P. J. Liacos, *Massachusetts Evidence*, §§ 4.4.8 and 8.17 (7th ed. 1999, Brodin and Avery eds.) (Liacos).

Undersigned counsel reviewed Lynch's case with Dr. Lukes [A. 292, par. 9(m)]. Dr. Lukes recalled and reviewed the evidence and assumptions he relied on for his testimony (e. g., A. 125-159, 7/55-82), plus the new observations of Kimberly and Dr. Kiley. Dr. Lukes stated that those observations, either singly or combined, would be consistent with, and would be additional sound bases for, his opinions at the Motion To Suppress hearing and at trial on Lynch's state of mind and body during the custodial interrogation. Kimberly's observations about

---

[18] See, also, The Standard-Times (New Bedford) story on the arraignment quoting Dr. Kiley and Mr. Fagan to the same effect [A. 291, par. 9(l), and A. 308].

four hours before the custodial interrogation and Dr. Kiley's observations about ten-twelve hours after the interrogation are mutually supporting, as are the Bridgewater State Hospital medical records showing treatment and medications Lynch received there soon after his arraignment [A.309-322, A. 275, par. 2].[19] Dr. Lukes would so testify if subpoenaed for deposition or hearing [A. 292, par. 9(m)].

Suppression of Lynch's custodial statements would have changed the course of the trial. According to Sgt. Loud at trial, Lynch told her that: Geremia grabbed the knife; he then grabbed the knife from her and stabbed her; he used his right hand and stabbed her in the stomach on the right side. Defendant described to her how Geremia was stabbed [5/150]. Later, she stated:

> He was then asked when he stabbed her, and he stated that he stabbed her when she grabbed the knife. He was asked why he stabbed her, and he stated because he was pissed [5/164].

"[A] defendant's statement is usually 'the key item in the proof of guilt, and certainly one of overpowering weight with the jury.'" *Commonwealth v. Tavares*, 385 Mass. 140, 152, 430 N.E. 2d 1198 (1982) (citations omitted). Sgt. Loud's testimony on defendant's statement was the only clear evidence of Lynch's having the knife in his hand.[20] Without that, the jury would only have had Steven Moosick's testimony [4/94-96], which does not actually put the knife in Lynch's hand.

---

[19] These records were not obtained for trial to bolster Lynch's testimony [7/21-26], consistent with his affidavit [A. 275, par. 2], about receiving treatment.

[20] If the jury believed Sgt. Loud, they could have thought that "once the defendant was able to wrest the knife away from the victim, any right to use self-defense terminated. The defendant could not have reasonably feared imminent death or serious bodily harm once he was in possession of the knife." *Commonwealth v. Nunes*, 430 Mass. 1, 5, 712 N.E 2d 88 (1999) (citations omitted).

32

Also, Moosick's use of the word, "killed," which he attributes to defendant, does not equal "murder" under G.L. c. 265 §1. Lay persons such as Lynch would not be expected to know the legal elements that make a "killing" into a "murder."[21] According to the court's instructions, "killings" would <u>not</u> be murder if accidental, or in the use of reasonable force in self-defense [7/221-225; 229]; if in the use of excessive force in self-defense, or in the heat of passion upon reasonable provocation or in sudden combat [7/228]; or if defendant was unable to have the requisite state of mind for any of the three prongs of malice due to intoxication [7/230]. Even if Lynch did make this statement to Moosick: " ... If they find the body, [I'm] going to jail for life. They ain't got a case without the body [4/95]," that could be evidence of his ignorance of the complexities of the law of homicide, consistent with evidence of consciousness of guilt for being somehow involved with a killing, but not necessarily murder.[22] But such evidence does not necessarily reflect feelings of guilt or actual guilt [7/215-216]. Without the police testimony on Lynch's custodial statements, the jury would likely have been at the reasonable doubt stage for first-degree murder, leaving open a guilty verdict on a lesser crime, or even an acquittal. The jury could have believed that the defendant "killed a girl" and also could have more easily believed that he "didn't mean to do it [4/94]." Also, under the circumstances, Moosick was not as strong a witness as Sgt. Loud.

---

[21] Cf. *Commonwealth v. King*, 374 Mass. 501, 373 N.E. 2d 208 (1978) (defendant inflicted two fatal stab wounds on victim; while both drinking, they got into "senseless brawl;" defendant's unsworn statement to jury seems a layman's assertion that, despite his "fortuitously" having a knife and using it on victim, he did not intend to inflict mortal injury). *Id.* 505-508.

[22] The same ignorance and consciousness of guilt would explain defendant's not telling the whole truth to Officer Horman [6/191-193], and defendant's leaving the farm eight days after the burial [3/94-107].

33

Lastly, if testimony about Lynch's custodial statements had been suppressed, there might have been no need to have him testify, have him describe the June 5-6, 1992 events, have him give a demonstration of his struggle with Geremia, be subjected to impeachment by his own counsel [6/188-193], and be subjected to cross-examination.[23] Without the custodial statements and without Lynch's trial testimony, the Commonwealth would have had slim or no evidence on: (1) Lynch's motive or state of mind in the cottage, (2) on what happened in the cottage, and (3) what happened afterwards. Much of the evidence on those subjects harmed him at trial. Likewise, there might have been no need to have Dr. Lukes testify, hence no evidence, comment or argument on defendant's alcoholism, and no opportunity for the prosecutor to raise the Global Goals evidence (direct appeal, issue no. 5, *ante* page 3).

There would have been no apparent downside to Kimberly's, Dr. Kiley's or Mr. Hoey's testifying at the Motion To Suppress hearing. Lynch had a right to effective assistance of counsel Sixth and Fourteenth Amendments, United States Constitution, as well as the rights thereunder to produce all proofs that may be favorable to him. See, *Commonwealth v. Haggerty*, 400 Mass. 437, 441, 509 N.E. 2d 1163 (1987); *Eldridge v. Atkins*, 665 F. 2d 228, 236 (8th Cir. 1981) (ineffective assistance of counsel presumed when counsel failed to interview important witness); and other federal cases cited in Klein, *The Emperor Has No Clothes: The Empty Promise of the Constitutional Right to Effective Assistance of Counsel*, 13 Hastings Const. L. Quarterly 625, 665, n. 221-222, 224; American Bar Association, *Standards For Criminal Justice*, Standard 4-4.1 (2nd ed. 1986) (counsel must fully investigate the case regardless of his client's "admissions"); Massachusetts Committee For

---

[23] See discussion on the Struggle demonstration, Ground four, *post*, for an example of the harm which befell defendant during his testimony. Attorneys Mitchell and Rubin agree that they probably would not have put Mr. Lynch on the stand if his custodial statements had been suppressed [A. 294, par. 11 (c)].

34

Public Counsel Services, *Professional Guidelines Governing Representation of Indigents in Criminal Cases*, 1.1, 1.3, 4.1, 4.6, 6.1 (similar). Failure to have Kimberly, Dr. Kiley, or Mr. Hoey testify at the hearing was error by defense counsel that was likely to have influenced the outcome of the case.

**Ground three**: MISSING EVIDENCE ON CUSTODIAL STATEMENTS (AT TRIAL).

If, on the small chance that the missing evidence would not have been enough to change Judge Steadman's mind, or if the witnesses did not testify at the Motion To Suppress hearing, or if defense counsel still wanted Lynch to testify at trial, the missing evidence would have made a difference at trial for many of the same reasons discussed in Ground two, *ante.* The missing evidence would have affected the jury's consideration of Lynch's custodial statements if the jurors followed the court's "humane practice" instructions. [7/213], *Commonwealth v. Paszko, supra.*, 391 Mass. 179. The jury might well have rejected Sgt. Loud's testimony on the custodial statements, and on her observations and non-observations in the apartment and at the interrogation. This, in turn, would have increased defendant's credibility on, for example, his version of the struggle [6/171-178], and his disagreements with Sgt. Loud's testimony on other points [6/209; 7/32, 34, 36, 43, 46-49, 52]. The missing evidence might also have increased defendant's credibility on his disagreements with Moosick's testimony [7/40-41].[24]

There is yet another point on which the missing evidence would have enhanced Mr. Lynch's credibility. The cabdriver testified that Lynch asked him to stop at the road leading uphill to the farm and that, after some talk with Geremia, Lynch told him to drive them up to the farm

---

[24] See discussion in *Arizona v. Fulminante*, 499 U.S. 279, 297-300 (1991) (in assessing impact and credibility of one witness's testimony, testimony by a second witness tends to make the less believable testimony of first witness more believable).

[2/154-155]. The prosecutor used this to suggest that defendant was not so intoxicated, and that he was able to think and reason, viz.,

> Ed Lynch was doing something he shouldn't do, ... he was bringing a female back to the cottage, and I think you can infer from this evidence that he didn't want to be detected by the cab coming up there. So, he wanted to walk up with his guest [7/172-173].

Lynch had testified, simply, that most of the times when he took a cab back to the farm, he would walk up the hill [6/164]. With the missing evidence, it would have been easier for the jury to believe that requesting to be dropped off at the bottom of the hill was automatic, out of habit, after Lynch had come home from one of his "drunks," and not by any rational, deliberated or pre-meditated design on that particular day. That line of the prosecutor's argument went directly to Lynch's mental state for the three prongs of malice and his ability to deliberately premeditate.

There would have been no apparent downside to having the witnesses testify at trial.

**D.  Ground four**:  Petitioner was deprived of effective assistance of counsel when his counsel failed to pre-test and rehearse the in-court reenactment, during which counsel used himself as a stand-in for the decedent, Geremia, so that it would not backfire on counsel or his client. The hoped-for purpose of reenactment was to have defendant show the jury how he struggled with Geremia. Defense counsel is at least a foot taller than Geremia, thus making it physically awkward for defendant to accurately demonstrate. This permitted the prosecutor to have the defendant make the same physically awkward demonstration using the prosecutor as a stand-in, thus permitting the prosecutor to remark adversely upon the physical awkwardness in closing argument for the purpose of diminishing defendant's credibility and his self-defense theory.

During Lynch's direct examination, his defense counsel had him participate in a demonstration, a reenactment. According to counsel, he had Lynch try to demonstrate how the struggle between the defendant and Geremia unfolded and their relative positions during the struggle [A.

296, par. 11(g)]. Defense counsel Mitchell is six feet tall, and yet he used himself as a stand-in for the five foot tall Geremia in the reenactment with the six feet two inch defendant [6/175-176].[25] Counsel did not consider the height difference meaningful before attempting the reenactment. It did not occur to him to use someone else, even his female associate, Ms. Rubin, who is about five feet six inches tall. He thinks he rehearsed it with Lynch, but he is not absolutely sure. Attorney Rubin did not think the height difference to be important [A. 296, par. 11 (g)]. Lynch states that defense counsel did not rehearse the reenactment with him and did not tell him that he would be asked to reenact the struggle during his trial testimony using Attorney Mitchell as a stand-in for Geremia [A. 278, par. 5]. The reenactments were awkward and damaging to the defendant, as shown by the prosecutor's derisive remarks in his closing on the subject to diminish Lynch's credibility.

> Self defense. Please. Did you see the contortions this defendant went through when he's trying to describe how he stabbed 6 foot Gaziano and 6 foot Mitchell and then he was reminded it was 5 foot Geremia? OOPS. I guess I didn't mean that.
> .....
> And then this big guy is allegedly incapacitated. While his arms are all out in some contorted position she's able to kick him in the groin during this life and death struggle. And he goes down. And poor Ed Lynch is incapacitated by Andrea Geremia, and she just runs into that knife [7/182-183].

Defense counsel's conduct violates two, long-standing principles: that one must not use a demonstration at trial that does not as closely as possible have the same conditions as in the original event and; that one

---

[25] The prosecutor, also six feet tall, made the defendant go through the same awkward demonstration, using himself in place of defense counsel [6/210].

must not try a demonstration at trial unless one is virtually certain that it will work.[26]

An accurate demonstration of how the struggle between the defendant and Geremia unfolded and their relative positions might have been helpful in raising reasonable doubt on the murder charge. The defendant's credibility was "on the line." The trial judge called the struggle "a complicated factual scenario [A. 379-380]," but he does not dispute the awkwardness and damaging effect of the reenactments. Such a "complicated factual scenario" required greater care that should have been taken by a "reasonably competent attorney" performing "within the range of competence demanded of attorneys in criminal cases." *United States v. Cronic, supra*, 466 U.S. 655. Such a lawyer would have done a pretest in order to avoid the harm in cross-examination and closing argument. Better work, by subjecting the reenactment to a pretested "dry run," might have accomplished something material for the defendant. Counsel's failure to appreciate the height dissimilarity, the resulting awkwardness, and undue prejudice caused thereby satisfies the *Strickland* test for ineffective assistance of counsel.

Lynch Pet. Writ Habeas Corpus Mar. 2004

---

[26] See, e. g., Schweitzer, *Cyclopedia of Trial Practice*, sec. 227 (2nd ed., and 1997 supple.): "Counsel should weigh carefully the advisability of attempting use of demonstrative ... evidence before a jury. Unless he has fully satisfied himself that the use ... creates no undue prejudice, that conditions are not substantially dissimilar; ... he might be pursuing the wiser course to forego its use." See, also, *United States v. Skinner*, 425 F. 2d 552 (D. C. Cir. 1970), cited in BNA, *Criminal Practice Manual*, Sec. 101-1001[3] (1996) (demonstration by prosecutor to show angle of trajectory); *United States v. Chavis*, 476 F. 2d 1137, 1143 (D. C. Cir. 1973) (no lawyer should rely on a witness to simply "tell his story"); "these [in-court reenactments] should be pretested so that they will not backfire on counsel or his client," Carlsen, *Criminal Law Advocacy*, Sec. 6.03 (b) [iii] (incl. 1997 supple.); "As with other witnesses, the defendant's testimony should be subjected to 'dry runs' to clear up any inconsistencies or omissions." Amsterdam, *Trial Manual for Defense of Criminal Cases*, 280 (1984).

38