SCANNED
DATE: 06/17/04
BY: SKY

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EDWARD H. LYNCH<br>    Petitioner,<br><br>v.<br><br>EDWARD FICCO<br>    Respondent. | )<br>)<br>)<br>)<br>)   Civil Action No. 04-10502-RWZ<br>)<br>)<br>)<br>) |

### RESPONDENT'S MEMORANDUM OF LAW
### IN OPPOSITION TO THE PETITION FOR HABEAS CORPUS

After a jury trial before Massachusetts Associate Justice Stephen E. Neel in Plymouth Superior Court, the petitioner was convicted of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. After unsuccessfully pursuing a motion for a new trial and an appeal in the Massachusetts state courts, the petitioner filed the instant petition for habeas corpus pursuant to 28 U.S.C. § 2254. By this habeas action, the petitioner contends that his continued incarceration by the respondent, Edward Ficco, the Superintendent of the Souza Baranowski Correctional Center, violates federal law. This memorandum of law is submitted in opposition to the petition for habeas corpus. As argued in this memorandum, the petition must be denied because the petitioner's jury instruction claim is in procedural default and the petitioner cannot demonstrate cause and prejudice or actual innocence to excuse the default. Furthermore, the petition should be denied where the petitioner cannot demonstrate that the state court's adjudication of his ineffective assistance of counsel claims on the merits resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

## **PRIOR PROCEEDINGS**

On January 26, 1993, a Plymouth County grand jury returned an indictment charging the petitioner with murder in the first degree. *See* Respondent's Supplemental Answer, [hereinafter cited as "Supp. Ans., Ex.__"] Exhibit 1, Docket Entries, *Commonwealth v. Lynch*, PLCR93579. On February 23, 1995, after a jury trial before Massachusetts Superior Court Associate Justice Stephen E. Neel, the petitioner was found guilty of murder in the first degree and sentenced to life in prison. *Id.* The petitioner timely filed a notice of appeal, and on December 17, 1997, the petitioner, through counsel, filed a motion for stay of appeal, along with a motion to remit motion for new trial and a motion for funds to trial judge. *See* Supp. Ans., Ex. 13, Docket Entries, *Commonwealth v. Lynch*, SJC-07492. On December 22, 1997, the Massachusetts Supreme Judicial Court ("SJC") entered an order staying the appeal and remanded the motion for new trial and the motion for funds to Plymouth Superior Court. *Id.* Both motions were entered in the Plymouth Superior Court on December 30, 1997. *See* Supp. Ans., Ex. 1, Docket Entries, *Commonwealth v. Lynch*, PLCR93579.

On April 14, 2000, the trial judge denied the petitioner's motion for funds and his motion for a new trial, and the petitioner appealed. *Id.* On October 17, 2001, in the SJC, the petitioner filed a motion for stay pending appeal and to remand the matter to trial court in light of the recent amendment to Mass. R. Crim. P. 30(c)(5). *See* Supp. Ans., Ex. 13, Docket Entries, *Commonwealth v. Lynch*, SJC-07492. On October 18, 2001, the SJC issued an order staying the appeal pending the disposition of the petitioner's motion for funds, that was remanded to the Plymouth Superior Court for disposition in light of the amendment to Mass. R. Crim. P. 30(c)(5).

*Id.* On August 9, 2001, the trial judge denied the petitioner's renewed motion for funds, and the petitioner appealed.

In his consolidated appeal to the SJC, the petitioner raised the eight claims. *See* Supp. Ans., Ex. 6, Defendant-Appellant' Brief and Record Appendix on Appeal, SJC No. 07492. On June 12, 2003, the SJC affirmed the petitioner's conviction and the orders denying the motion for a new trial, the motion for funds and the motion for a reduced verdict. *See* Supp. Ans., Ex. 10, *Commonwealth v. Lynch*, 439 Mass. 532, 789 N.E.2d 1052 (2003). On June 20, 2003, the petitioner filed a petition for re-hearing in the SJC that was denied on July 23, 2003. *See* Supp. Ans., Ex. 12 and 13. The petitioner also filed a petition for a writ of certiorari in the United States Supreme Court that was denied on December 1, 2003. *See* Supp. Ans., Ex. 14.

On March 10, 2004, the petitioner filed the instant petition for habeas corpus pursuant to 28 U.S.C. § 2254. The respondent filed an answer and supplemental answer on May 12, 2004. The respondent hereby submits this memorandum of law in opposition to the petition for habeas corpus.

## STATEMENT OF FACTS

The recitation of the underlying facts by the Supreme Judicial Court is entitled to the presumption of correctness under 28 U.S.C. §2254(e)(1). *Dolinger v. Hall*, 302 F.3d. 5, 7 n. 5 (1st Cir. 2002). As the United States Court of Appeals for First Circuit has noted, "[a] habeas petitioner must clear a high hurdle before a federal court will set aside any of the state's factual findings." *Mastracchio v. Vose*, 274 F. 3d 590, 598 (1st Cir. 2001). The state court's findings of facts can be overcome only if the petitioner demonstrates that they were "based on an unreasonable determination of the facts in light of the evidence presented in the State court

proceedings." *Id.* at 597-598, *quoting* 28 U.S.C. § 2254(d)(2). The SJC found the following facts concerning the murder of Andrea Geremia:

> In June, 1992, [petitioner] resided in a two-room cottage on the grounds of a hog farm in Lakeville. He was employed by the owner of the farm to perform various chores including feeding the pigs and caring for the grounds of the farm, and was allowed to live in the cottage rent free. Early in the afternoon of June 5, 1992, [petitioner] took a taxicab to a bar in Taunton where he proceeded to drink "twelve to fourteen bottles of beer" over a period of several hours. At approximately 7 P.M. he moved on to another bar in Taunton, the Lounge 44, where he remained until it closed at 1 A.M., leaving only once for ten minutes around 9:30 P.M. to purchase a pint bottle of vodka. While at Lounge 44, [petitioner] drank beer and, after it closed, huddled in a doorway sipping his bottle of vodka and napping until 6 A.M., when he entered a luncheonette and had breakfast. After breakfast, [petitioner] returned to Lounge 44 and resumed drinking. Between 8 A.M. and 2 P.M. when [petitioner] finally left Lounge 44, he had consumed (according to his testimony) approximately seven bottles of beer and seven rum and cokes.
>
> At noon, Andrea Geremia entered Lounge 44. [Petitioner] perceived her to be a prostitute, and in the course of a brief conversation, Geremia agreed to engage in sexual activity with him in exchange for fifty dollars. At 2 P.M. they left in a taxicab driven by Fred Howe. Howe had driven [petitioner] home from bars in Taunton on "quite a few" occasions, and, on this occasion, did not think [petitioner] was intoxicated.
>
> [Petitioner] and Geremia entered his cottage and sat at the kitchen table for some period of time. She drank a soft drink and he had two beers. He gave her fifty dollars which she tucked into her bra. They then proceeded to the bedroom where Geremia attempted to perform oral sex on [petitioner], who was unable to become aroused and passed out before the sexual act was completed. Sometime thereafter, [petitioner] awoke to the sound of a squeaky dresser drawer being opened. He saw Geremia walking away from the drawer with her hand down her shirt and believed that she had stolen his money. He became angry and followed her into the kitchen where she confronted him with a ten-inch boning knife. [Petitioner], at six feet, two inches tall and weighing 180 pounds, easily overpowered the much smaller Geremia, grabbed the knife from her, and stabbed her in the chest and stomach. He then watched as she bled to death. The next day [petitioner] used a front-end loader to bury Geremia's body in a trench on the farm used for the disposal of dead pigs. Her disappearance remained unsolved, and her whereabouts unknown, until early in 1993.
>
> In or about October, 1992, while incarcerated at the Plymouth County house of correction on unrelated charges, [petitioner] confided in another inmate, Steven Moosick, that he had stabbed "a girl" he suspected of robbing him and had buried her body. Moosick conveyed the information to another inmate and the police eventually interviewed Moosick. Acting on this information, the State police and Lakeville public

works personnel uncovered Geremia's body on January 4, 1993, buried on the hog farm alongside pig carcasses. Her body was badly decomposed but was identified through dental records. A forensic pathologist determined that Geremia had been stabbed five times in the chest and abdomen, each of the wounds sufficient to be fatal by itself. Two other wounds were evident on her back and side.

By the time Geremia's body was discovered, [petitioner] had been released from custody. At approximately 9:30 P.M. on January 4, 1993, State police found [petitioner] sleeping in the living room of a friend's apartment. He was arrested and taken to the State police barracks were he was advised of his Miranda rights. He was questioned at the barracks from approximately 10 P.M. until midnight, during which he admitted meeting a woman in Lounge 44, returning to his cottage with her, passing out and awakening to find her taking money from his drawer, snatching a knife from her, stabbing her with it once in the stomach, watching her die, burning her clothes, and dumping her body in a trench on the farm.

At trial, [petitioner]'s defense was that the stabbing had occurred in self-defense or was accidental, that as a result of heavy drinking, his sense of reality was altered at the time of the stabbing, and that the statements he made to the State police on January 4, 1993, were not voluntary. On the witness stand, [petitioner] denied intentionally stabbing Geremia and testified that she was stabbed inadvertently in the course of a struggle during which Geremia herself held the knife, tried to stab him, kneed him in the groin, and slapped him about the head and face. On realizing she had been stabbed, [petitioner] testified he tried to stop the bleeding by pressing a dish towel onto the stab wound. [Petitioner] and his trial counsel conducted a choreographed reenactment of this struggle for the jury in which trial counsel portrayed Geremia.

The defense also presented evidence regarding [petitioner]'s extensive history of alcohol abuse, including two specific events: [petitioner]'s heavy consumption of alcohol on June 5 and 6, 1992, just prior to the stabbing, and a drinking binge just prior to his arrest that [petitioner] claimed lasted seventeen days from December 19, 1992, to January 4, 1993, and included two friends, Donald Podzka and Patricia MacDonald.

Dr. James Lukes testified as the defense expert on the effects of alcohol addiction, excessive drinking, and withdrawal from alcohol on human perceptions, reactions, reason, and anxiety. He testified about "blackout[s]" (periods of time during which a very intoxicated person may appear sober and competent to the casual observer and may perform intricate tasks unconsciously and successfully, but will have no memory of the task), "confabulation" (which occurs when a person confuses reality with fantasy or present circumstance with unrelated past experience, and melds the two together to create a cogent story of events), and "delirium tremors" (which occur when a person goes through the end stage of detoxification and may suffer hallucinations and delusions as well as severe physical illness). Dr. Lukes then opined that, given the events of June 5 and June 6, a hypothetical person with [petitioner]'s history and in [petitioner]'s position

5

> on the afternoon of June 6 would have awoken from his passed out state "feeling numb" and could have been "working in a blackout" or "hallucinating" during the period when Geremia was stabbed. Dr. Lukes also opined that, given the nature of the seventeen-day drinking binge, a hypothetical person with [petitioner]'s history and in [petitioner]'s position on the evening of January 4, 1993, would have awoken from his slumber with some anxiety, would have been unable to cogently answer specific questions, and "[r]ecall would be very poor"; he would have been "uncoordinat[ed]," "very agitated," and "very restless." He also testified that [petitioner] had been a heavy user of alcohol for twenty-five years and had developed a very high tolerance for it.

See Supp. Ans., Ex. 10, *Commonwealth v. Lynch*, 439 Mass. 532, 534-537, 789 N.E.2d 1052, (2003).

I.  **The Petitioner Is Not Entitled To Habeas Corpus Relief Where His Jury Instruction Claim Is Procedurally Defaulted And He Has Failed To Establish Cause And Prejudice Or That A Miscarriage Of Justice Will Result If The Claim Is Not Reviewed.**

"The habeas corpus anodyne is designed neither to provide an additional layer of conventional appellate review nor to correct garden-variety errors, whether of fact or law, that may stain the record of a state criminal trial. Rather, the remedy is limited to the consideration of federal constitutional claims." *Burks v. DuBois*, 55 F.3d 712, 715 (1st Cir. 1995). *See Herrera v. Collins*, 506 U. S. 390, 400 (1993) (affirming that the purpose of federal habeas corpus review is to ensure that individuals are not imprisoned in violation of the Constitution). *See also Barefoot v. Estelle*, 463 U. S. 880, 887 (1983) ("Federal courts are not forums in which to relitigate state trials"). Thus, federal habeas review is precluded, as a general proposition, when a state court has reached its decision on the basis of an adequate and independent state-law ground. *See Coleman v. Thompson*, 501 U. S. 722 (1991). In *Coleman*, the Supreme Court held that where

6

> a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.* at 750. *See Horton v. Allen,* 2004WL1171383 *30 (1st Cir. 2004); *Tart v. Massachusetts,* 949 F.2d 490, 496-497 (1st Cir. 1991); *Palmariello v. Superintendent of M.C.I. Norfolk,* 873 F.2d 491, 493 (1st Cir.), *cert. denied sub nom., Palmariello v. Butler,* 493 U. S. 865 (1989). A petitioner's procedural default constitutes an adequate and independent state ground so long as the state consistently applies the rule and has not waived it. *Horton v. Allen,* 2004WL1171383 * 30 (1st Cir. 2004); *Gunter v. Maloney,* 291 F.3d 74,79 (1st Cir. 2002); *Burks v. DuBois,* 55 F.3d at 716; *Puleio v. Vose,* 830 F.2d 1197, 1199 (1st Cir. 1987), *cert. denied,* 485 U. S. 990 (1988). The jurisdictional nature of the independent and adequate state ground inquiry requires that it be addressed by this Court at the outset. *Lambrix v. Singletary,* 520 U. S. 518, 523-24 (1997).

The petitioner claims that the state court trial judge violated his right to due process by allowing the murder conviction even though several renditions of jury instructions relative to factors negating malice effectively relieved the Commonwealth of proving malice beyond a reasonable doubt. *See* Petition at ¶ 12(A). As the petitioner conceded in his brief to the SJC, there was no objection to the jury instructions at trial. *See* Supp Ans., Ex. 5 at p. 43. Because this claim was raised for the first time on appeal, without objection in the trial court, the SJC reviewed it only to determine whether the judge's jury instruction relative to the Commonwealth's burden of proof "created a substantial likelihood of a miscarriage of justice." *See* Supp. Ans., Ex. 10, *Commonwealth v. Lynch,* 439 Mass. at 543-44, 789 N.E.2d at 1060-61.

Massachusetts has "a long standing rule that issues not raised at trial...are treated as waived..." *Commonwealth v. Curtis*, 417 Mass. 691, 626, 632 N.E.2d 821, 827 (1994). The rationale behind the waiver doctrine is that a defendant who fails to bring his claim to the attention of the reviewing court at the earliest possible time, waives his right to the court's resolution of that claim. *See Lykus v. Commonwealth*, 432 Mass. 160, 163, 732 N.E.2d 897, 900 (2000), *quoting Commonwealth v. Pisa*, 384 Mass. 362, 365-366, 425 N.E.2d 290, 293(1981). Thus, in Massachusetts, appellate review of waived claims is limited to the discretionary standard of whether the claimed transgression created a substantial risk of a miscarriage of justice. *See Horton v. Allen*, 2004WL1171383 * 30 (1st Cir. 2004); *Burks v. Dubois*, 55 F.3d at 716; *Puleio v. Vose*, 830 F.2d at 1199. Here, the SJC reviewed this procedurally barred claim under that standard. *See* Supp. Ans., Ex. 10, *Commonwealth v. Lynch*, 439 Mass. at 543-44, 789 N.E.2d at 1060-61. The SJC determined that although the trial judge erred in the assignment of the burden of proof in defining voluntary manslaughter, in the context of a charge that repeatedly emphasized that the Commonwealth bore the burden of proof beyond a reasonable doubt on all the elements of the crime charged, the error did not create a substantial likelihood of a miscarriage of justice. *See* Supp. Ans., Ex. 10, *Commonwealth v. Lynch*, 439 Mass. at 544, 789 N.E.2d at 1061. This limited review undertaken pursuant to the Massachusetts "miscarriage of justice" standard does not operate as a waiver of the underlying procedural default. *Burks*, 55 F.3d at 716, n. 2.

To the contrary, such review constitutes the "classic example of an independent and adequate state ground" supporting the application of the procedural default rule. *Simpson v. Matesanz*, 175 F.3d 200, 207 (1st. Cir. 1999). Since the SJC resolved petitioner's jury

instruction claim on state law grounds, this habeas court may consider the claim only if the petitioner establishes "cause and prejudice" with respect to the procedural default or demonstrates to this Court his actual innocence. *See Dretke v. Haley*, – U.S.– , 124 S. Ct. 1847, 1851-52 (2004). The petitioner has made no attempt to show "cause," "prejudice," or a miscarriage of justice to excuse the default, nor could he. Here, the fact that petitioner does not even attempt to demonstrate cause for his procedural default effectively ends the inquiry for this Court.

Although this Court need not consider the prejudice question, in fact, the petitioner could not demonstrate prejudice if this Court fails to address this claim. Prejudice requires the petitioner to demonstrate "not merely that the errors at . . . trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Ortiz v. Dubois*, 19 F.3d 708, 714 (1st Cir. 1994), quoting *United States v. Frady*, 456 U. S. 152, 170 (1982). Petitioner can make no such presentation here. As noted by the SJC in its review under the "substantial likelihood of a miscarriage of justice" standard, the judge's jury instruction adequately conveyed to the jury the Commonwealth's burden of proof on all the elements of the crime charged. *See* Supp. Ans., Ex. 10, *Commonwealth v. Lynch*, 439 Mass. at 544, 789 N.E.2d at 1061. The SJC noted that the trial judge followed his incorrect instruction by correctly instructing that "where there is evidence of provocation the Commonwealth has the burden of proving beyond a reasonable doubt that the [petitioner] did not act in the heat of passion." *Id.* at 543-44. The SJC further noted that later in his instruction, the judge again emphasized that "the Commonwealth has the burden of proving beyond a reasonable doubt that the [petitioner] did not act in the heat of

9

passion on sudden provocation. You may not return a verdict of guilty of murder unless the Commonwealth meets this burden." *Id.* at 544. Thus, it cannot be said that the judge's jury instruction on voluntary manslaughter worked to the petitioner's actual and substantial disadvantage, or that it infected his entire trial with error of constitutional dimensions. *See Ortiz v. Dubois*, 19 F.3d at 714.

Absent cause and prejudice sufficient to excuse his procedural default, the only other avenue available to the petitioner – that a refusal to hear his defaulted claim relative to the trial judge's jury instruction on identity – would result in a "fundamental miscarriage of justice" – is foreclosed. *Simpson v. Matesanz*, 175 F. 3d at 210. This exception to the procedural default rule is "'seldom to be used, and explicitly tied to a showing of actual innocence.'" *Killela v. Hall*, 84 F.Supp.2d 204, 210 (D. Mass. 2000) (*quoting Burks*, 55 F. 3d at 717). No such showing has been or could be made here, thus petitioner's default cannot be excused.

**II.   The Habeas Petition Should Be Denied Where the Petitioner's Ineffective Assistance of Counsel Claims Were Properly Adjudicated by the SJC Which Did Not Render A Decision That Was Contrary To, Or An Unreasonable Application of, Clearly Established Federal Law.**

   **A.   The Standard of Review.**

"Under the AEDPA, a state prisoner can prevail only if the state court's decision 'was contrary to, or involved an unreasonable application, of clearly established Federal law, as determined by the Supreme Court of the United States.'" *Tyler v. Cain*, 533 U.S. 656, 660 (2001) (*quoting* 28 U.S.C. § 2254(d)(1)). A state-court decision is "contrary to" clearly established Supreme Court precedent in only two circumstances: (a) where "the state court applies a rule that contradicts the governing law set forth in" Supreme Court cases or (b) where "the state court confronts a set of facts that are materially indistinguishable from a decision of

10

[the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

A state-court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407-09, 413. Merely that the state court reached an incorrect result is not sufficient – the result also must be unreasonable. *L'Abbe v. DiPaolo*, 311 F.3d 93, 96 (1st Cir. 2002) (*citing Taylor*, 529 U.S. at 411); *see also McCambridge v. Hall*, 303 F.3d 24, 36-37 (1st Cir. 2002) (en banc) ("'some increment of incorrectness beyond error is required'. . . . The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court," *quoting Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Where, for instance, the state court reaches a result that is "devoid of record support for its conclusion or is arbitrary," the unreasonable application prong likely will be satisfied. *McCambridge*, 303 F.3d at 37 (*citing O'Brien v. Dubois*, 145 F.3d 16, 25 (1st Cir. 1998)).

In some habeas cases, resolution of petitioner's claims will turn entirely on the state court's determination of the underlying factual issues. *DiBenedetto v. Hall*, 272 F.3d 1, 7 n.1 (1st Cir. 2001), *cert. denied*, 535 U.S. 1024 (2002). This is because, under the AEDPA, state court factual determinations are "presumed to be correct," unless the petitioner rebuts this "presumption of correctness" by coming forward with "clear and convincing evidence" to the contrary. 28 U.S.C. § 2254(e)(1); *Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir. 2000). The presumption of correctness applies to all "basic, primary, or historical facts" underlying the state

court's conclusion, *Sanna v. DiPaolo*, 265 F.3d 1, 7 (1st Cir. 2001); *see also Thompson v. Keohane*, 516 U.S. 99, 111-13 (1995) (for purpose of *Miranda*, scene-setting factual findings involving the trial court's assessment of credibility, are presumed to be correct), and extends to factual determinations made by both state trial and appellate courts. *Rashad v. Walsh*, 300 F.3d 27, 34 (1st Cir. 2002), *cert. denied*, 537 U.S. 1236 (2003).

In *Williams v. Taylor*, 529 U.S. at 390-391, the Supreme Court held that *Strickland v. Washington*, 466 U.S. 668 (1984) was the clearly established federal law that controlled claims related to ineffective assistance of counsel. Thus, a petitioner alleging ineffective assistance of counsel must establish two elements in state court in order to prevail:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense.

*Ouber v. Guarino*, 293 F.3d 19, 25 (1st Cir. 2002), *citing Strickland*, 466 U.S. at 687.

In state court, the petitioner bore the heavy burden of proving ineffective assistance, *Scarpa v. DuBois*, 38 F.3d 1, 8-9 (1st Cir. 1994), *cert. denied*, 513 U.S. 1129 (1995); *Lema v. United States*, 987 F.2d 48, 51 (1st Cir. 1993), which required the two-part analysis articulated above. First, "'judicial scrutiny of counsel's performance must be highly deferential.'" *Ouber v. Guarino*, 293 F.3d at 25, *citing Strickland*, 466 U.S. at 689. Furthermore, the reviewing court must not lean too heavily on hindsight: a lawyer's acts and omissions must be judged on the basis of what he knew, or should have known, at the time his tactical choices were made and implemented. *Id., citing Bell v. Cone*, 535 U.S. 685, 696 (2002); *United States v. Natanel*, 938 F.2d 302, 309 (1st Cir. 1991), *cert. denied*, 502 U.S. 1079 (1992). Only if, "in light of all the

circumstances, the [alleged] acts or omissions of counsel were outside the wide range of professionally competent assistance," can a finding of deficient performance ensue. *Ouber v. Guarino*, 293 F.3d at 25, *quoting Strickland*, 466 U.S. at 690. Finally, counsel's alleged blunders are not to be "judged solely by the 'surrounding circumstances' of the representation, but, rather, [are to] be judged [by the state court] in light of the whole record, including the facts of the case, the trial transcript, the exhibits, and the applicable substantive law." *Scarpa v. DuBois*, 38 F.3d at 15. See *Matthews v. Rakiey*, 54 F.3d 908, 911 (1st Cir. 1995).

Secondly, even if a lawyer's performance is constitutionally unacceptable, relief will be withheld unless the petitioner demonstrates that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ouber v. Guarino*, 293 F.3d at 26, *quoting Strickland*, 466 U.S. at 694. While this level of prejudice may be presumed in a few settings, that is the exception, not the rule. *Id.* (citing *Strickland*, 466 U.S. at 694). Indeed, the petitioner must demonstrate that he was prejudiced, *i.e.*, that his attorney's parlous conduct may have altered the outcome of the case. *Id.* (citing *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000)). Although the possibility of a different outcome must be substantial in order to establish prejudice, it may be less than fifty percent. *Id.*(citing *Strickland*, 466 U.S. at 693 (explaining that "a [petitioner] need not show that counsel's deficient conduct more likely than not altered the outcome in the case")).

   B.   **The Massachusetts SJC's Denial of the Petitioner's Ineffective Assistance of Counsel Claims Relative to Trial Counsel's Failure to Call Three Additional Witnesses (John Hoey, Dr. Cornelius Kiley, and Patricia McDonald's daughter Kimberly) To Testify At His Hearing On A Motion To Suppress And During Trial Was Neither Contrary to, Nor an Unreasonable Application of Federal Law.**

The petitioner claims that counsel was ineffective because he failed to call three additional witnesses (John Hoey, Dr. Cornelius Kiley, and Patricia McDonald's daughter, Kimberly) to testify at his motion to suppress hearing and at trial. *See* Petition at ¶¶ 12(B) and 12(C). The petitioner asserts that if these three witnesses had been called, they would have provided additional testimony to support his claim that his statements were involuntary. *See* Petition at ¶¶ 12(B) and 12(C). In its review of the record, the SJC rejected these assertions explaining:

> Lynch filed a motion to suppress the statements he made to the State police after his arrest on January 4, 1993, asserting that his alcoholic condition made them involuntary. He also made voluntariness an issue at trial, seeking and receiving a humane practice instruction. In each proceeding, he called three witnesses to support his contention (and his own testimony) as to his consumption of alcohol and the effects he was suffering at the time of his statements to the police. Donald Podzka and Patricia MacDonald were drinking with Lynch on January 4, 1993, and testified that Lynch had been drinking all during the day, concluding early in the evening when he went to sleep in their living room. Dr. Lukes testified as an expert witness on the likely effects of the consumption of the quantities of alcohol testified to by Lynch, Podzka, and MacDonald. (FN1)[1] Lynch claims that his counsel was ineffective because he failed to call three additional witnesses (John Hoey, Dr. Cornelius Kiley, and Patricia MacDonald's daughter, Kimberly) to testify at each of these proceedings. Lynch asserts that if these three witnesses had been called, they would have provided further testimony supporting his claim that his statements were involuntary.

---

[1] The State police sergeant who interviewed Lynch on the night of January 4, 1993, testified that Lynch showed no signs of inebriation or withdrawal during the interview and that Lynch told her that he had not had a drink since 9 A.M. that morning.

Only Hoey provided an affidavit explaining what he would have testified to had he been called as a witness. At the time of Lynch's arraignment, Hoey was a staff writer for The Enterprise, a Brockton newspaper. Although he asserted no independent memory of Lynch's physical, mental, or emotional condition during his arraignment on January 5, he states in his affidavit that he would have testified as to what other people said at the arraignment, statements he later quoted in his article on Lynch's arraignment published on January 6, 1993. Such testimony offered for the truth of the matter asserted would have been inadmissible hearsay, see *Commonwealth v. Figueroa*, 422 Mass. 72, 77, 661 N.E.2d 65 (1996); *Commonwealth v. Fourteen Thousand Two Hundred Dollars*, 421 Mass. 1, 5, 653 N.E.2d 153 (1995), and counsel can hardly be faulted for not presenting it.

Neither Dr. Kiley nor Kimberly submitted affidavits. Through appellate counsel's affidavit, Lynch claims that Dr. Kiley, the court psychiatrist who interviewed him on the day of his arraignment, would have testified that Lynch was suffering from alcohol withdrawal at the time of his arraignment. Similarly, he claims that Kimberly (whose last name, address, and telephone number are apparently unknown) would have testified that Lynch was drinking and was "ossified" when she stopped by to drop off groceries at the apartment where Lynch, Podzka, and MacDonald were drinking, between 5 and 6 P.M. on January 4, 1993 (four to five hours before his arrest and subsequent statements). This affidavit is inadequate to sustain Lynch's claim that trial counsel was ineffective, and a new trial required.

First, the affidavit of appellate counsel as to what Dr. Kiley and Kimberly would have testified is inadmissible hearsay, and the motion judge acted well within his discretion in concluding that it failed "to present facts or make supportable sworn offers of proof of expected evidence sufficient to require a new trial." See *Commonwealth v. Francis*, 432 Mass. 353, 372, 734 N.E.2d 315 (2000). Second, with respect to Dr. Kiley, his written evaluation of Lynch's condition on January 5, 1993, belies the assertions in appellate counsel's affidavit. Dr. Kiley categorized Lynch as "alert," with "moderate" anxiety, a "normal"rate of speech, "connected" thought processes, "unimpaired" concentration, and "unimpaired" reality testing. The evaluation noted that Lynch exhibited "some body tremors," but made no mention of suspected alcohol withdrawal. From this evaluation, it would have appeared to trial counsel that had Dr. Kiley been called to testify at the hearing his testimony would have been favorable to the Commonwealth on the question of Lynch's ability to think and communicate clearly, and not favorable to Lynch. Third, the testimony of Kimberly, assuming she was available to counsel and would have testified as appellate counsel claims, would have been cumulative of the testimony of Donald Podzka and Patricia MacDonald.

15

> In sum, Lynch has failed to meet his burden of demonstrating that trial counsel's decision not to call these additional witnesses was manifestly unreasonable or created a substantial likelihood of a miscarriage of justice. (FN2)[2]

See Supp. Ans., Ex. 10, *Commonwealth v. Lynch*, 439 Mass. at 537-539, 789 N.E.2d at 1056-57. In its decision, the SJC analyzed the ineffective assistance of counsel claim by ascertaining whether there was error committed by the defense counsel, and if so whether the error created a substantial likelihood of a miscarriage of justice. *Commonwealth v. Lynch*, 439 Mass. at 537, 789 N.E.2d at 1056 (2003), citing *Commonwealth v. Kosilek*, 423 Mass. 449, 457-458, 668 N.E.2d 808 (1996); *Commonwealth v. Wright*, 411 Mass. 678, 681-682, 584 N.E.2d 621 (1992). The *Wright* standard is at least as generous to the petitioner as the federal ineffective assistance of counsel standard. *Horton v. Allen*, 2004 WL1171383, *21 (1st Cir. May 26, 2004) (citing *Mello v. DiPaolo*, 295 F. 3d 137, 144-45 (1st Cir. 2002). In other words, *Strickland* and its progeny do not require an outcome "contrary to" that reached by the SJC.

Further, a review of the SJC's decision demonstrates that it was an objectionably reasonable application of *Strickland*. In the instant case, the record supports the SJC's conclusion that the petitioner offered nothing in his motion for new trial to establish that his counsel was "manifestly unreasonable" in not presenting these additional witnesses. See Supp. Ans., Ex. 10, *Commonwealth v. Lynch*, 439 Mass. at 538, 789 N.E.2d at 1057 (2003). In the

---

[2] It is significant that no affidavit from trial counsel was submitted in connection with Lynch's motion for a new trial. *Commonwealth v. Serino*, 436 Mass. 408, 415-416, 765 N.E.2d 237 (2002) (affirming denial of motion for new trial based on claim of ineffective assistance of counsel where motion was not supported by affidavit of trial counsel); *Commonwealth v. Vasquez*, 55 Mass.App.Ct. 523, 533-534, 772 N.E.2d 60 (2002) (affirming denial of motion for new trial, and noting conspicuous absence of affidavit from trial counsel in support of motion); *Commonwealth v. Savage*, 51 Mass.App.Ct. 500, 505 n. 6, 746 N.E.2d 1029 (2001) (same).

Memorandum and Order denying the petitioner's post-trial motions, the trial judge clearly stated that appellate counsel's affidavit in support of the motion for a new trial contained no more than inadmissible hearsay, and Hoey's affidavit in support of the motion for new trial made no claim of personal knowledge. *See* Supp. Ans., Ex. 4 at p. 10-12. The trial judge also concluded that the petitioner failed to demonstrate an adequate factual basis on which to evaluate a claim of ineffective assistance of counsel. *Id.* Accordingly, the petitioner cannot demonstrate that the SJC decision unreasonably applied *Strickland*. Habeas relief should be denied.

> C. **The Massachusetts SJC's Denial of the Petitioner's Ineffective Assistance of Counsel Claim Relative to His Attorney's Allegedly Awkward Reenactment of the Struggle Between the Petitioner and the Victim Was Neither Contrary to, Nor an Unreasonable Application of Federal Law.**

The petitioner also claims that counsel was ineffective where he presented the jury with an awkward reenactment of the struggle between the victim and the petitioner that the petitioner claimed resulted in the victim's stabbing. *See* Petition at ¶ 12 (D). In its careful and detailed review of the record, the SJC reasonably concluded that counsel's decision to stage the reenactment was not manifestly unreasonable and did not create a substantial likelihood of a miscarriage of justice, explaining:

> Lynch also claims that his trial counsel was ineffective because he presented the jury with an awkward reenactment of the struggle between Lynch and Geremia that Lynch claimed resulted in Geremia's stabbing. During Lynch's direct examination, trial counsel asked Lynch to step down from the witness stand and demonstrate his struggle with Geremia. Lynch's trial counsel, who was six feet tall, played the part of five-foot tall Geremia in the demonstration. (FN3)[3] The crux of Lynch's complaint in this regard is that the height

---

[3] The transcript of the demonstration is as follows:

DEFENSE COUNSEL: "Your Honor, may the witness step down and demonstrate?"
THE JUDGE: "Yes, he may."

difference between trial counsel and Geremia created such an awkward depiction of the struggle that it damaged Lynch's defense. (FN4)[4] Lynch also claims that the reenactment was not rehearsed.

In support of this claim, Lynch submitted his own affidavit and the affidavit of appellate counsel. Contrary to the assertions in Lynch's affidavit, the affidavit of appellate counsel states that trial counsel and co-counsel told him that the reenactment was not hindered by any height difference between trial counsel and Geremia, and that the reenactment had probably been rehearsed.

The judge who witnessed the reenactment and also heard Lynch's posttrial motions, found that "[t]he decision to reenact the stabbing was not manifestly unreasonable" and "was a

---

DEFENSE COUNSEL: "Now, pretend I'm Andrea Geremia. You say the knife was in her right hand, correct?"
THE DEFENDANT: "[Witness nods head.]"
DEFENSE COUNSEL: "And you say she lunged towards you with a knife?"
THE DEFENDANT: "[Witness nods head.]"
DEFENSE COUNSEL: "Now using me and doing it gently, would you show the members of the jury what happened between you and her, and as you do it say it verbally to the reporter what you're demonstrating. Go ahead."
THE DEFENDANT: "I grabbed her by the arm like this, then put my hand over her hand, my right hand over her hand. And when I did that, that's when she kneed me in the groin."
DEFENSE COUNSEL: "And when she kneed you in the groin what happened?"
THE DEFENDANT: "I went down on one knee."
DEFENSE COUNSEL: "Go ahead."
THE DEFENDANT: "And I just kept pushing her back and pushing her back. I thought she was slapping me in the face with her free hand, and she's trying to swap the knife into her free hand. And I just held, held on like this, and I pushed her back and pushed her back until she couldn't go back anymore. She was against the washing machine, and that's when I noticed she had been stabbed."
DEFENSE COUNSEL: "And when you noticed she had been stabbed, what did you see?"
THE DEFENDANT: "The blood. My head was down because she was smacking me in the face. Her blood was dripping on the sleeve and on my knee and my thigh."
DEFENSE COUNSEL: "Can he go back on the witness stand, Your Honor?"
THE JUDGE: "Yes."

[4] We fail to see how it would have assisted the defense to use someone of Geremia's small stature during the demonstration, as it would only have emphasized how much larger Lynch was and how unlikely his claim of self-defense was.

18

> valid tactical decision." The judge's decision in this regard is entitled to substantial deference, *Commonwealth v. Jackson*, 428 Mass. 455, 466, 702 N.E.2d 1158 (1998), and we see no reason to afford it any less. The decision to stage the reenactment was not manifestly unreasonable and did not create a substantial likelihood of a miscarriage of justice.

*See* Supp. Ans., Ex. 10, *Commonwealth v. Lynch*, 439 Mass. at 539-540, 789 N.E.2d at 1058-1059 (2003). The record demonstrates that the SJC reasonably concluded that the decision to stage the reenactment was not manifestly unreasonable. In the Memorandum and Order denying the petitioner's post-trial motions, the trial judge explained that trial counsel utilized a demonstration to portray a complicated factual scenario to the jury, and the demonstration, as with every strategic decision to present evidence, carried a certain amount of risk. *See* Supp. Ans., Ex. 4 at pp. 15-16, citing *Commonwealth v. Martino*, 412 Mass. 267, 289 (1992)(decision to call witness who gave harmful testimony when cross-examined not ineffective); *Commonwealth v. Carlos*, 38 Mass. App. Ct. 929, 931 (1995)(no ineffective assistance shown from risky trial strategy). The trial judge concluded that the trial counsel's strategy was a valid tactical decision. *See* Supp. Ans., Ex. 4 at p. 16. Thus, the petitioner cannot demonstrate that the SJC unreasonably determined that trial counsel's decision to stage the reenactment was not manifestly unreasonable and did not create a substantial likelihood of a miscarriage of justice. Habeas relief must be denied.

## CONCLUSION

For the foregoing reasons, the petition for habeas corpus relief should be denied.

Respectfully submitted,

THOMAS F. REILLY
Attorney General

Eva M. Badway
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200, ext. 2824
BBO # 635431

Dated: June 16, 2004

## Certificate of Service

I hereby certify that on June 16, 2004, I caused a copy of the above Memorandum of Law in Opposition to the Petition for Habeas Corpus to be served by first-class mail, postage prepaid, upon Mr. Emanuel Howard, *Esq.*, P.O. Box 66067, Newton, Massachusetts 02466-0002.

Eva M. Badway