statement" attached to the second of these, sandwiched by two misstatements. *Id.* 434 Mass. 19-20, 746 N.E. 2d 483-484. The Commonwealth stated at oral argument, that "if *Fickling* is o.k., then this case is o.k."

If this Court reviews the trial judge's instructions as a whole, it would conclude that the instructions were internally contradictory and did not make it sufficiently clear to the jury that the Commonwealth had the burden to disprove beyond a reasonable doubt mitigating circumstances negating malice. This deficiency is clearly seen when we consider the judge's introductory instructions. At the outset, he told the jury that

> [a]ll of my instructions are equally important. Do not single out some and ignore others. You must follow the law as I state it to you, whether you agree with it personally or not [7/191].

The evidence would have supported a finding of both malice and mitigating factors negating malice. But the Commonwealth, of course, would not have had any incentive or desire to offer to prove, or to argue to the jury that it had proved beyond a reasonable doubt that there existed in this case mitigating factors negating malice.

At best, therefore, this court would have "no way of knowing which of the [several renditions] of irreconcilable instructions the jurors applied in reaching their verdict." *Francis v. Franklin*, 471 U.S. 307, 322 (1985). This uncertainty destroys the confidence in the verdict required by *In re*

*Winship, supra*, 397 U.S. 364, where the prosecution in the instant case must prove malice aforethought, an element of the crime of murder, beyond a reasonable doubt. "It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." *Ibid*, as quoted in *Mullaney v. Wilbur, supra*, 421 U.S. 700. The court in *Mullaney* recognized the vital liberty interests arising from the differential in sentencing ranges between a murder and a manslaughter conviction. *Id*. Petitioner, here, faced a similar differential, *i.e.*, ranging from a fine to a mandatory life sentence.

The instructions as a whole leave people in doubt whether the petitioner was erroneously convicted of murder in the first degree instead of manslaughter. The "saving" instruction that the SJC discussed did no more than contradict the preceding incorrect instructions. But then the "saving" instruction was followed by several incorrect and contradictory instructions [7/245-251]. A reasonable juror could easily have resolved the contradictions in the instructions by choosing to abide by the last words he heard on the topic and apply the incorrect, inverted instructions. Cf. *Francis v. Franklin, supra*, 471 U.S. 321, n.7 ("certainly reasonable to expect a juror to attempt to make sense of a confusing earlier portion of the instruction by reference to a later portion of the instruction").

Nothing in the instructions as a whole makes clear to a reasonable juror that one (or more) of these contradictory instructions carries more weight than the others, especially where the judge told the jury, "[a]ll of my instructions are equally important. Do not single out some and ignore others [7/191]." He soon follows this by emphasizing that the juror "must accept the entire law that I'm going to give you. That is my first [indispensable or key] instruction that you accept the law as I state it to you [7/192]." Another reasonable juror, therefore, could have easily resolved the contradictions by using the incorrect, inverting instructions to cancel-out the correct ones, thus depriving petitioner of the due process protections set forth in *Mullaney v. Wilbur*, supra 421 U.S. 697-698. Given the circumstances, one cannot discount the possibility that the jury may have interpreted the incorrect instructions in an unconstitutional manner. *Francis v. Franklin, supra,* 471 U.S. 321-324.

Under the rule applied by the SJC, "a defendant can be given a life sentence when evidence indicates that it is as likely as not that he deserves a significantly lesser sentence. This is an intolerable result in a society where, to paraphrase Mr. Justice Harlan, it is far worse to sentence one guilty only of manslaughter as a murderer than to sentence a murderer for the lesser crime of manslaughter. *In re Winship*, 397 U.S., at 372 (concurring opinion)." *Mullaney v. Wilbur, supra,* 421 U.S.703-704.

23

Here, malice is an intent-related element of the crime of murder. *Ante* at 8][12] "[T]he Due Process Clause prohibits a state from making use of jury instructions that have the effect of relieving the state of the burden of proof enunciated in *Winship* on the critical question of intent in a criminal prosecution." *Francis v. Franklin, supra,* 471 U.S. 326-327, citing and reaffirming *Sandstrom v. Montana, supra,* 442 U.S. 521. Based upon all of the foregoing, there is a reasonable likelihood that the jury used the irreconcilable instructions in a fundamentally unfair way which relieved the prosecution of the burden of persuasion on an element of the crime.

5  <u>If petitioner's ground one claim was not sufficiently preserved in the trial court, such so-called "procedural default" is excused by his trial counsel's ineffectiveness</u>.

There is no question that there was sufficient evidence warranting the instructions, and that the SJC admitted that the judge's instructions contained "*Acevedo*" errors. *Lynch,* 789 N.E.2d at 1060.

Where the absence of trial counsel objections to the trial judge's incorrect instructions were deemed insufficient to preserve his constitutional claim, petitioner's appellate argument presented the SJC with the opportunity to review it in two ways: (a) ineffective assistance of counsel [DB 46, 63, Reply B 13], and (b) substantial likelihood of miscarriage of justice. [DB 46-47, 64-65]. The SJC chose only the latter.

---

[12] See *Francis v. Franklin, supra,* 471 U.S. 317, citing *Mullaney v. Wilbur, supra,* 421 U.S. 698-701, where, as here, the issue of mitigating factors negating malice bears on the question of intent.

"'[T]he adequacy of state procedural bars to the assertion of federal questions ... is itself a federal question.'" *Lee v. Kemna*, 534 U.S.362, 375 (2002), quoting *Douglas v. Alabama*, 380 U.S. 415, 422 (1965). Ineffective assistance of counsel in a constitutional sense is accepted as a "cause" excusing a procedural default. *Coleman v. Thompson*, 501 U.S. 722, 750-752 (1991); *Murray v. Carrier*, 477 U.S. 478, 488 (1986), and must, as here, have been fairly presented to the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 450-454 (2000).

Trial counsel's failure to adequately assert petitioner's due process constitutional trial rights to instructions free of *Acevedo* errors, in light of the pre-1995 opinions, *ante* at 11 & 13, satisfies the performance prong of the *Strickland* test. He should have understood the consequences of such errors, i.e., that they "created the significant possibility that the [petitioner] was erroneously convicted of murder in the first degree instead of manslaughter," *Commonwealth v. Boucher, supra*, 532 N.E.2d 39. In other words, "the errors at ... trial ... [would have] worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Ortiz v. Dubois*, 19 F.3d 708, 714 (1st Cir. 1994).

There could be no reasonable strategic or tactical benefit in failing to assert petitioner's rights. Thus, petitioner has "shown that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. 687.

25

As to prejudice, a timely objection at trial would have caused the trial judge to forcibly correct the errors, thus substantially improving the chances of a manslaughter conviction, rather than a murder conviction. Had counsel timely objected and the trial judge failed or refused to correct the errors, the SJC would have had the issue on review under different circumstances, i.e. prejudicial error would have to be decided under the "harmless beyond a reasonable doubt" standard.[13] *Estelle v. McGuire*, 502 U.S. 62, 72, n.4 (1991); *Boyde v. California*, 494 U.S. 370, 378 (1990); *Chapman v. California*, 386 U.S. 18, 24 (1967).[14] Because there were so many inversions and contradictions, and the trial judge told the jury that all of his instructions were equal and were to be followed, *ante* section 3, it would be impossible to tell which of those instructions the jury actually followed. Under those circumstances, the SJC would have had to apply the *Chapman* standard to constitutional errors of this sort and would have found reversible error on due process grounds, because the Commonwealth could not prove beyond a reasonable doubt that the error was harmless. *Ids.* Thus, "there is a reasonable probability that, absent the errors, the factfinder would have

---

[13] The respondents concede that SJC review under the substantial likelihood of miscarriage of justice standard is a "limited review." [Respondent's Opposition at 8]. The SJC applied a "center of gravity" test, *ante*, section 4.

[14] See, also, *Francis v. Franklin*, *supra*, 323-324, n.7, citing *Stromberg v. California*, 283 U.S. 359 (1931) (well settled law "that when there exists a reasonable possibility that the jury relied on an unconstitutional understanding of the law in reaching a guilty verdict, that verdict must be set aside").

had a reasonable doubt respecting guilt." *Strickland, supra,* 466 U.S. 695.

### 6  The state court decision is contrary to clearly established Supreme Court precedent, or constitutes an unreasonable application of relevant Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

There was evidence from which the jury could conclude that petitioner acted in the heat of passion upon reasonable provocation or in sudden combat, thus negating a finding of malice, an essential element in the crime of murder. Recognizing the inversions, the SJC nevertheless performed a "center of gravity" analysis on the question of prejudice, and unreasonably ignored the trial judge's instructions that all of his instructions equally important; that the jury was not to single out some and ignore others [7/191], that the jury was to accept entire law as it is given by judge [7/192], and also unreasonably ignored the record which showed that after the "saving" instruction in *Commonwealth v. Fickling, supra,* the judge followed this by several inversions, see section 3, *ante.* The SJC's analysis ran counter to *Sandstrom v. Montana,* 442 U.S. 514 (see n.11, *ante*). And, more importantly, the SJC and this court would have no way of knowing which of the several renditions of irreconcilable instructions the jurors applied in reaching their verdict. *Francis v. Franklin, supra,* 471 U.S. 322.

Under the circumstances, the judge's instructions violated clearly established federal law by improperly relieving the Commonwealth of the burden of proving an essential element of the crime of murder. *Mullaney*

27

*v. Wilbur, supra*, 421 U.S. 697-698, 704; In re Winship *supra*, 397 U.S. 364, *Francis v. Franklin, supra, Sandstrom v. Montana, supra.*

### 7. Habeas relief is merited under any appropriate "harm" standard.

In *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), the Supreme Court articulated a "less onerous" standard for assessing the impact of a state court's constitutional error on collateral review. Under *Brecht*, a federal court may grant habeas relief on account of constitutional error only if it determines that the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." *See id.* at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *Sanna v. DiPaolo, supra*, 265 F.3d. 14. Under this standard, however, the petitioner should prevail whenever the record is "so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of the error." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). As the Fifth Circuit views this, if the mind of the reviewing judge is "in virtual equipoise as to the harmlessness under the *Brecht* standard, of the error," then she "must conclude that it was harmful." *Robertson v. Cain* 324 F.3d 297, 304-305 (5th Cir. 2003), (quoting *Woods v. Johnson*, 75 F.3d 1017, 1026-27 (5th Cir.1996) (in turn quoting *O'Neal*, 513 U.S. at 435). Whether under the *Chapman, Strickland*, or even under this "less onerous" standard, the petitioner should prevail on this claim because clear and unambiguous proper instructions on how the Commonwealth was to

discharge its burden on mitigating circumstances negating malice would have substantially raised petitioner's chances in obtaining a manslaughter rather than a murder conviction.

**Ground two**: Petitioner was deprived of effective assistance of counsel when his counsel failed to call one or more witnesses in the Motion To Suppress hearing who would have bolstered the testimony of defendant's two lay witnesses, would have provided stronger evidence for defendant's expert pharmacologist on which to base his opinion concerning the involuntary aspect of defendant's custodial statements, and would have helped defendant to suppress those statements used against him at trial. AND

**Ground three**: Petitioner was deprived of effective assistance of counsel to call one or more of those same witnesses at trial, where their testimony would have been benefited defendant to refute the trial testimony of police officers on the circumstances surrounding defendant's arrest and interrogation and to provide stronger, credible evidence (in addition to testimony from the same two lay witnesses and defendant) for defendant's expert pharmacologist to base his opinion on whether defendant's custodial statements were voluntary. In addition, diminution of the officers' credibility would have increased defendant's credibility in general, and in particular on his testimony concerning his struggle with the decedent, Andrea Geremia, and his testimony conflicting with police officers' and Steven Moosick's, thereby enhancing his self-defense and negation of malice theories.

1. Grounds two and three: Missing evidence on custodial statements: Introduction. [15]

Grounds two and three concern missing evidence at the 1994 hearings on defendant's Motion to Suppress custodial statements, and at the 1995 trial. Petitioner has gone as far as possible to show that he could produce admissible evidence on this substantial issue at an evidentiary hearing on the new trial motion: (1) through undersigned counsel's affidavit offering what both Kimberly ( a married woman with children, who is Pat's daughter) and Dr. Cornelius Kiley ( the psychologist who examined petitioner during the morning of his arraignment) would be expected to say at a hearing or trial, while explaining why they would not supply their own affidavits at this time [A. 285-291]; (2) through copies of newspaper articles, attested copies of Wareham District Court records, Dept. of Correction Health Services

---

[15] It is important to keep in mind on these two grounds, and also on ground four, that the SJC took an inappropriate approach to the facts. When it "recites the facts as the jury could have found them in the light most favorable to the Commonwealth" [*Lynch*, 789 N.E.2d 1055], it takes an approach only appropriate to an issue challenging the sufficiency of evidence to convict. *Commonwealth v. Latimore*, 378 Mass. 671, 676, 393N.E.2d 370 (1978). But here, where petitioner did not appeal from a denial of a motion for a required finding of not guilty, the court's approach indicates an unfair bias toward the Commonwealth, and also amounts to implicit fact-finding. Issues such as the missing evidence on custodial statements at the Motion to Suppress hearing and the struggle demonstration -- all require viewing the evidence as a whole. Doing otherwise amounts to an unreasonable determination of facts well outside the scope of the court's appellate function. *Commonwealth v. Peixoto*, 430 Mass. 654, 662, 722 N.E.2d 470 (2000), citing cases (credibility is for the jury, not for appellate courts); *United States v. Bayko*, 774 F.2d 516, 520 (1st Cir.1985) (appellate courts not equipped to try factual disputes, or to resolve credibility issues).

30

records [A. 298-322], and Mr. John Hoey's affidavit [A. 327-329]; (3) through motions for funds to depose Kimberly, Dr. Kiley, and others in order to provide sworn testimony in keeping with the offers of proof already submitted, in the event that the trial judge, to whom the new trial motion was referred, did not deem the above material to be adequate [A. 67, 330-357].

Petitioner, thus, has met the holding and rationale of *Commonwealth v. Figueroa*, 422 Mass. 72, 661 N.E. 2d 65 (1996). He has shown that he would be able to produce witnesses to offer relevant, admissible evidence, id. 78-79, if only given the chance at a deposition or at an evidentiary hearing. Cf. *Commonwealth v. Truong*, 34 Mass. App. Ct. 668, 615 N.E. 2d 208 (1993) (although defendant's request for evidentiary hearing on new trial motion relied on inadmissible hearsay, those statements are buttressed, as here, by other information and fact that Commonwealth has produced no counter affidavits). Id. 675. The missing evidence would have made a difference in the outcome.

2. Ground two: Missing evidence on custodial statements (at motion to suppress hearing).

Paragraphs 4 and 7 of the defendant's Amended Motion to Suppress relate to custodial statements he allegedly made to police officers on the night of his arrest [A. 18-19, 24]. *Commonwealth v. Freeman*, 430 Mass. 111, 114, 712 N.E. 2d 1135 (1999) (two-fold inquiry); *Commonwealth v. Paszko*, 391 Mass. 164, 177, 461 N.E. 2d 222

(1984) (statement made by person incapable of withholding information due to physical or mental impediments cannot be used as evidence against him). Steadman, J. (the motion judge) denied the motion, mainly because he did not find credible the testimony of Pat and Don, who provided the major basis for Dr. Lukes' (petitioner's expert's) opinion [A. 81-82, pars. 13-17; A. 86, par. 14].

Evidence at the Motion to Suppress hearing (and at trial) detailed petitioner's chronic alcoholism: his drinking since age 15 and for over 25 years, and numerous treatments for that condition [A. 125-137; 6/ 128-133]. Dr. Lukes reviewed defendant's alcohol-related treatment records from several facilities. He also interviewed Lynch. Dr. Lukes then opined on the impairment that defendant's drinking had on the voluntariness and rationality of the custodial statements allegedly made to the police between 10:00 p.m. and midnight on January 4. Dr. Lukes based his answers and opinions on hypothetical facts including Lynch's seventeen day drinking binge, and Lynch's passing out sometime around 6-8:00 p.m. on the night of his arrest after having been drinking [A. 136-159]. [16]

---

[16] Dr. Lukes opined that Lynch would be in the beginning of detoxification and withdrawal, with possible seizures, observable jitteriness and shaking, probably very anxious, probably nervous, and probably with abdominal pain. Lynch's thought process would be rambling: he would be "unable to choose," and not focus. His judgment and reasoning would be adversely affected, his memory would be deteriorating, and he could begin confabulating (mixing fact with fiction). Lynch's free will and volition would be compromised, and he would be open to psychological coercion. With all this, one might not be able to see an unsteady gait or a slurring of speech [A. 136-147].

Lynch told defense counsel about Pat's daughter, Kimberly, about her visits to the apartment during the drinking binge period, and what she would have observed, especially during her visit in the late afternoon of the day he was arrested, when she saw him drinking [A. 275, par. 2 and diagram, A. 279]. Defense counsel did not call Kimberly to testify at the Motion to Suppress hearing or at the trial. Kimberly's testimony for Lynch at the Motion to Suppress hearing would have been invaluable. She would have been the only witness who was not an alcoholic and did not participate in the binge who also observed him during the binge and just a few hours before his arrest. She would have provided credible evidence on: (a) the quantity of drinking during the binge; (b) the disorder and mess in the apartment compared with the orderly and clean way Lynch kept another apartment; (c) defendant's being "ossified" and "tired, drained and scruffy" around 6:00 p.m. on the day of his arrest; (d) and on observing him drinking at around 6:00 p.m. [A. 285-289, pars. 1-8].[17]

---

[17] Here is a comparison of testimony from witnesses on key aspects: <u>(a) time of police arrival in the Oakland Avenue apartment</u>: Sgt. Loud: arrived at building at 9:15 p.m., but did not get into the apartment building until about fifteen minutes later, i. e., 9:30 p.m. [A. 99-100]; Don: early evening after Lynch passed out, which was about an hour before the police arrived [A. 112]; Pat: she was asleep [A. 122]; <u>(b) appearance of apartment</u>: Sgt. Loud: did not notice any alcoholic beverage containers [A. 101-102]; Don: messy appearance inferred from his description of drinking behavior throughout binge [A. 106-115]; Pat: alcoholic beverage containers all over the small living room, and also in kitchen [A. 120, and see diagram A. 279]; <u>(c) drinking on day of arrest and Lynch's last drink</u>: Sgt. Loud: Lynch's last drink was 9:00 a. m., as allegedly told to her by him [A. 98]; Don: "We'd get up in the morning. Start drinking as soon as we got up and continue drinking 'till we passed out or ran out of booze." Immediately before Lynch passed, out he was

Kimberly would have provided a more credible basis for Dr. Lukes' opinion. The motion judge found Pat's and Don's testimony unpersuasive [A. 81, pars. 13-14], not credible [A.86, par. 14], and that Dr. Lukes' opinion was entitled to no weight because

> [Don's and Pat's testimony] was a major basis for Dr. Lukes [sic] opinion. While I find Dr. Lukes qualified to testify in this area, I reject his opinion [A.86, par. 14].

The motion judge made a special point that, although Lynch was drinking prior to his arrest, he found that

> there was a <u>fourteen hour hiatus</u> between his last drink at 8:00 a.m.[sic] on January 4, 1993 and the time of his statement to the police at 10:00 p.m. on January 4, 1994 [A. 86, par. 15, emphasis supplied].[18]

---

drinking beer and vodka. Lynch had nothing to eat that day [A. 111, 114, 115]. If the police arrived at the apartment at 9:30 p.m., and if Lynch passed out about an hour before they arrived, and he was drinking up to the time he passed out, his last drink would have been at 8:30 p.m.; Pat: Lynch began drinking at 6:00 -7:00 a.m. and, when she went to bed at about 6:00 p. m., Lynch and Don were still drinking vodka and beer in the living room [A. 119, 121-122]; Lynch testified at trial that police woke him at about 9:00 p.m. and that he had his last drink a couple of hours before he was arrested [6/201]; (d) smell of alcohol on Lynch's breath: Sgt. Loud: even though she came as close to Lynch as "within inches," she did not detect an odor of alcohol from him [A. 104-105]; Don and Pat: inferred from their respective descriptions of Lynch's drinking on that day. State Police Officer Coppenrath testified at trial, consistent with his testimony at the motion hearing, that he detected an odor of alcohol coming from defendant's person while seated two-three feet away from him in the interrogation room at about 10:00 p.m. that night [4/123, 139].

[18] The 8:00 a.m. time for the last drink here, and at A. 80, par. 10, are probably "typos," since the only evidence on that from Sgt. Loud was 9:00 a. m. [A. 98].

34

Where Kimberly's testimony would have shortened the "hiatus" to only four hours, the judge could have rationally inferred that Mr. Lynch drank vodka and beer during that interim. With Kimberly's testimony, the judge would have had an easier time believing Don's testimony to the effect that Lynch kept on drinking until he passed out (at about 8:30 p.m. by inference) [A.112-115]. There is a reasonable probability that the motion judge would have concluded that the Commonwealth had not met its burden of proof to satisfy him of voluntariness beyond a reasonable doubt, *Commonwealth v. Tavares*, 385 Mass. 140, 151-152, 430 N.E.2d 1198 (1982), and would have suppressed the custodial statements, all based upon Pat's, Don's, and Dr. Lukes' testimony enriched by Kimberly's testimony.

There was another unused, but available, source of credible evidence for Dr. Lukes' opinion. Dr. Kiley, a forensic psychologist, observed and evaluated defendant on competence to stand trial, G. L. c.123, §15(a), at his January 5, 1993 murder charge arraignment in Wareham District Court [A. 300-305]. This was between 10:00 a.m. and noon, and correspondingly between ten and twelve hours after the custodial interrogation had ceased the previous night [A. 289, par. 9(a-j)].[19] Dr. Kiley recalls that Lynch looked "hung over," was shaking during the interview, appeared to be in a great deal of discomfort from withdrawal of alcohol, was depressed, had a flat affect, and answered

---

[19] Lynch says it was about 11:00 a.m. [A. 276, par. 2].

questions in a monotone [A. 289, par. 9(h)]. Dr. Kiley's neutral, professional observations at sometime between ten and twelve hours after Lynch's custodial interrogation would have benefited Lynch at the Motion to Suppress hearing. His testimony would have provided Dr. Lukes' additional credible bases for his opinion.[20]

Dr. Kiley's observations between 10:00 a.m. and noon were consistent with Lynch's reporting.[21] Unfortunately, Dr. Kiley refused to give Lynch the benefit of his affidavit on the above, after consulting with some colleagues. He would, however, appear for deposition or hearing to answer questions about his observations if subpoenaed [A. 289, par.9(b)].

Other corroborative evidence. John T. Hoey [A. 327-329], employed by the Enterprise newspaper in Brockton between 1983 and July 1997, covered criminal court proceedings and wrote stories about them. He covered Lynch's arraignment for the instant charges, but had no immediate independent memory thereof. He recalled a few facts about

---

[20] Dr. Kiley's testimony would have also lent credence to Lynch's trial testimony. Lynch testified that he did not feel well during the interrogation and asked for medical assistance, to no avail. The police officers said, "we'll see," and so he told the officers "what they wanted to hear," as long as he could hope to receive medical attention. He was confused, scared, suffered from shakes, and was still intoxicated [6/200-205; 7/51]. Lynch saw Attorney Fagan and Dr. Kiley in the court's holding cell; he asked each of them to arrange for him to receive medical attention [A.276, par. 2]. He received medical attention and medications later that day at Bridgewater State Hospital [A. 311-316].

[21] Dr. Kiley's observations are also consistent with Dr. Lukes' answers, on cross-examination, regarding what Lynch's symptoms would have been January 4 between 10:00 p.m. and midnight had he stopped drinking about twelve hours before the custodial interrogation, i. e., "full blown withdrawal symptomology [A.156-159]."

the case while speaking to undersigned counsel on the telephone, and later reviewed a copy of his published story thereon. It was his usual and customary journalistic practice: (1) to make notes of a court proceeding he covered for use in the story he wrote about it; (2) to write the story later that same day, using those notes and; (3) to record the words he heard verbatim as they were being spoken, placing them within quotation marks along with the name of the person who spoke them, if he wanted to use them as quotations for the story. Based upon these practices, and on reviewing his story, he is able to say with a very high degree of confidence that his story is accurate and that words in the story within quotation marks were the actual words he heard spoken and recorded in court that day by the speaker to whom he attributed them, e. g., A.D.A. Frank Middleton, Dr. Kiley, and Mr. Lynch's attorney for the arraignment. Mr. Hoey quotes Dr. Kiley as telling the arraignment judge that Mr. Lynch "was in a great deal of discomfort from withdrawal of alcohol [A. 327-329]."[22]

---

[22] Because Kimberly and Dr. Kiley had declined to give their own affidavits, Mr. Hoey's evidence was obtained and offered to the state court to bolster defendant's supporting materials. It was offered to show what was said at the arraignment, to explain why certain things were done, and also because it tends to impeach Sgt. Loud. Mr. Hoey's statements come under the combined principles of business routine, *Commonwealth v. Carroll*, 360 Mass. 580, 587, 276 N.E. 2d 705 (1971); *O'Connor v. Smithkline Bioscience Labs. Inc.*, 36 Mass. App. Ct. 360, 365, 631 N.E. 2d 1018 (1994), and past recollection recorded, *Commonwealth v. Galvin*, 27 Mass. App. Ct. 150, 151-153, 535 N.E. 2d 623 (1989); see generally, P. J. Liacos, *Massachusetts Evidence*, §§ 4.4.8 and 8.17 (7th ed. 1999, Brodin and Avery eds.) (Liacos). See, also, The Standard-Times

37

Undersigned counsel reviewed Lynch's case with Dr. Lukes [A. 292, par. 9(m)]. Dr. Lukes recalled and reviewed the evidence and assumptions he relied on for his testimony (e. g., A. 125-159, 7/55-82), plus the new observations of Kimberly and Dr. Kiley. Dr. Lukes stated that those observations, either singly or combined, would be consistent with, and would be additional sound bases for, his opinions at the Motion To Suppress hearing and at trial on Lynch's state of mind and body during the custodial interrogation. Kimberly's observations about four hours before the custodial interrogation and Dr. Kiley's observations about ten-twelve hours after the interrogation are mutually supporting, as are the Bridgewater State Hospital medical records showing treatment and medications Lynch received there soon after his arraignment [A.309-322, A. 275, par. 2].[23] Dr. Lukes would so testify if subpoenaed for deposition or hearing [A. 292, par. 9(m)].

Suppression of Lynch's custodial statements would have changed the course of the trial. According to Sgt. Loud at trial, Lynch told her that: Geremia grabbed the knife; he then grabbed the knife from her and stabbed her; he used his right hand and stabbed her in the stomach on the right side. Defendant described to her how Geremia was stabbed [5/150]. Later, she stated:

---

(New Bedford) story on the arraignment quoting Dr. Kiley and Mr. Fagan to the same effect [A. 291, par. 9(l), and A. 308].

[23] These records were not obtained for trial to bolster Lynch's testimony [7/21-26], consistent with his affidavit [A. 275, par. 2], about receiving treatment.

He was then asked when he stabbed her, and he stated that he stabbed her when she grabbed the knife. He was asked why he stabbed her, and he stated because he was pissed [5/164].

"[A] defendant's statement is usually 'the key item in the proof of guilt, and certainly one of overpowering weight with the jury.'" *Commonwealth v. Tavares, supra*, 385 Mass.,152, 430 N.E. 2d 1198 (citations omitted). Sgt. Loud's testimony on defendant's statement was the only clear evidence of Lynch's having the knife in his hand.[24] Without that, the jury would only have had Steven Moosick's testimony [4/94-96], which does not actually put the knife in Lynch's hand.

Also, Moosick's use of the word, "killed," which he attributes to defendant, does not equal "murder" under G.L. c. 265 §1. Lay persons such as Lynch would not be expected to know the legal elements that make a "killing" into a "murder."[25] According to the court's instructions, "killings" would <u>not</u> be murder if accidental, or in the use of reasonable force in self-defense [7/221-225; 229]; if in the use of excessive force in

---

[24] If the jury believed Sgt. Loud, they could have thought that "once the defendant was able to wrest the knife away from the victim, any right to use self-defense terminated. The defendant could not have reasonably feared imminent death or serious bodily harm once he was in possession of the knife." *Commonwealth v. Nunes*, 430 Mass. 1, 5, 712 N.E.2d 88 (1999) (citations omitted).

[25] Cf. *Commonwealth v. King*, 374 Mass. 501, 373 N.E. 2d 208 (1978) (defendant inflicted two fatal stab wounds on victim; while both drinking, they got into "senseless brawl;" defendant's unsworn statement to jury seems a layman's assertion that, despite his "fortuitously" having a knife and using it on victim, he did not intend to inflict mortal injury). *Id.* 505-508.

39

self-defense, or in the heat of passion upon reasonable provocation or in sudden combat [7/228]; or if defendant was unable to have the requisite state of mind for any of the three prongs of malice due to intoxication [7/230]. Even if Lynch did make this statement to Moosick: " ... If they find the body, [I'm] going to jail for life. They ain't got a case without the body [4/95]," that could be evidence of his ignorance of the complexities of the law of homicide, consistent with evidence of consciousness of guilt for being somehow involved with a killing, but not necessarily murder.[26] But such evidence does not necessarily reflect feelings of guilt or actual guilt [7/215-216]. Without the police testimony on Lynch's custodial statements, there is a reasonable probability that the jury would have been at the reasonable doubt stage for first-degree murder, leaving open a guilty verdict on a lesser crime, or even an acquittal. The jury could have believed that the defendant "killed a girl" and also could have more easily believed that he "didn't mean to do it [4/94]." Also, under the circumstances, Moosick was not as strong a witness as Sgt. Loud.

Lastly, if testimony about Lynch's custodial statements had been suppressed, there might have been no need to have him testify, have him describe the June 5-6, 1992 events, have him give a demonstration of his struggle with Geremia, be subjected to impeachment by his own counsel

---

[26] The same ignorance and consciousness of guilt would explain defendant's not telling the whole truth to Officer Horman [6/191-193], and defendant's leaving the farm eight days after the burial [3/94-107].