[6/188-193], and be subjected to cross-examination.[27] Without the custodial statements and without Lynch's trial testimony, the Commonwealth would have had slim or no evidence on: (1) Lynch's motive or state of mind in the cottage, (2) on what happened in the cottage, and (3) what happened afterwards. Much of the evidence on those subjects harmed him at trial. Likewise, there might have been no need to have Dr. Lukes testify, hence no evidence, comment or argument on defendant's alcoholism, and no opportunity for the prosecutor to raise the Global Goals evidence (D.B. 34-37).

There would have been no apparent downside to Kimberly's, Dr. Kiley's or Mr. Hoey's testifying at the Motion To Suppress hearing. Lynch had a right to effective assistance of counsel Sixth and Fourteenth Amendments, United States Constitution, as well as the rights thereunder to produce all proofs that may be favorable to him. See, *Commonwealth v. Haggerty*, 400 Mass. 437, 441, 509 N.E. 2d 1163 (1987); *Eldridge v. Atkins*, 665 F. 2d 228, 236 (8th Cir. 1981) (ineffective assistance of counsel presumed when counsel failed to interview important witness); and other federal cases cited in Klein, *The Emperor Has No Clothes: The Empty Promise of the Constitutional Right to Effective Assistance of Counsel*, 13 Hastings Const. L. Quarterly 625, 665, n. 221-

---

[27] See discussion on the Struggle demonstration, Ground four, *post*, for an example of the harm which befell defendant during his testimony. Attorneys Mitchell and Rubin agree that they probably would not have put Mr. Lynch on the stand if his custodial statements had been suppressed [A. 294, par. 11 (c)].

222, 224; American Bar Association, *Standards For Criminal Justice*, Standard 4-4.1 (2nd ed. 1986) (counsel must fully investigate the case regardless of his client's "admissions"); Massachusetts Committee For Public Counsel Services, *Professional Guidelines Governing Representation of Indigents in Criminal Cases*, 1.1, 1.3, 4.1, 4.6, 6.1 (similar). Trial counsel's failure to have Kimberly, Dr. Kiley, or Mr. Hoey testify at the hearing satisfies both prongs of the *Strickland* standard.

3. Ground three: Missing evidence on custodial statements (at trial).

If, on the small chance that the missing evidence would not have been enough to change the motion judge's mind, or if the witnesses did not testify at the Motion To Suppress hearing, or if defense counsel still wanted Lynch to testify at trial, the missing evidence would have made a difference at trial for many of the same reasons discussed in Ground two, *ante*. The missing evidence would have affected the jury's consideration of Lynch's custodial statements if the jurors followed the court's "humane practice" instructions. [7/213], *Commonwealth v. Paszko, supra.*, 391 Mass. 179. The jury might well have rejected Sgt. Loud's testimony on the custodial statements, and on her observations and non-observations in the apartment and at the interrogation. This, in turn, would have increased defendant's credibility on, for example, his version of the struggle [6/171-178], and his disagreements with Sgt. Loud's testimony on other points [6/209; 7/32, 34, 36, 43, 46-49, 52]. The

missing evidence might also have increased defendant's credibility on his disagreements with Moosick's testimony [7/40-41].[28]

There is yet another point on which the missing evidence would have enhanced Mr. Lynch's credibility. The cabdriver testified that Lynch asked him to stop at the road leading uphill to the farm and that, after some talk with Geremia, Lynch told him to drive them up to the farm [2/154-155]. The prosecutor used this to suggest that defendant was not so intoxicated, and that he was able to think and reason, viz.,

> Ed Lynch was doing something he shouldn't do, ... he was bringing a female back to the cottage, and I think you can infer from this evidence that he didn't want to be detected by the cab coming up there. So, he wanted to walk up with his guest [7/172-173].

Lynch had testified, simply, that most of the times when he took a cab back to the farm, he would walk up the hill [6/164]. With the missing evidence, it would have been easier for the jury to believe that requesting to be dropped off at the bottom of the hill was automatic, out of habit, after Lynch had come home from one of his "drunks," and not by any rational, deliberated or pre-meditated design on that particular day. That line of the prosecutor's argument went directly to Lynch's mental state for the three prongs of malice and his ability to deliberately premeditate.

---

[28] See discussion in *Arizona v. Fulminante*, 499 U.S. 279, 297-300 (1991) (in assessing impact and credibility of one witness's testimony, testimony by a second witness tends to make the less believable testimony of first witness more believable).

There would have been no apparent downside to having the witnesses testify at trial.

4. <u>The SJC's discussion of the claims did not amount to a determination worthy of deference by a federal court, but if it was a determination, its analysis and determination is objectively unreasonable, and it contravenes, and constitutes an unreasonable application of U.S. Supreme Court precedent</u>.

(a) <u>The SJC's inappropriate approach to the facts</u>.

The SJC took an inappropriate and unbalanced approach to the facts. See *ante*, n. 15.

(b) <u>What the SJC unreasonably overlooks and misapprehends on the *Strickland* prongs</u>.

There is no doubt that the major questions for the jury were these: (1) who held the knife when the decedent was stabbed?; (2) what was Lynch's state of mind and mental condition then?; (3) what was his mental and physical condition at the custodial interrogation? At trial, there was a sharp credibility contest bearing on these critical questions between the testimony of MSP Sgt. Paula Loud and Lynch. Sgt. Loud says that Lynch told her that he grabbed the knife away from the decedent, that he stabbed her, and did it because he was "pissed." Lynch says that the decedent lunged at him; he was scared and grabbed her knife-wielding arm, and a struggle ensued during which she kneed him in the groin. Without Sgt. Loud's competing testimony, the jury would have accepted Lynch's testimony and, at least, have returned a verdict of manslaughter based upon excessive force in the exercise of self-defense.

44

That is why suppression of Lynch's alleged custodial statements to Sgt. Loud was of the utmost importance.

At the motion to suppress hearing, the factual credibility contest on the question of Lynch's mental and physical condition at the custodial interrogation was between Sgt. Loud for the Commonwealth, and Pat and Don for Lynch. As to the effect of Kimberly's evidence on the motion judge, had she been called at the motion to suppress hearing, the SJC treats her evidence as "cumulative"[29] just because Pat and Don spoke words at the hearing on similar topics. This is unreasonable. Cumulative evidence is "[a] evidence of the same character as existing evidence and that supports a fact <u>established</u> by the existing evidence (<u>esp. that which does not need further support</u>)." Black's Law Dictionary (7th ed., deluxe) at 577 (abbreviation and parens in the original; emphasis supplied). No fair reading of Judge Steadman's decision on the motion to suppress could lead one to infer that the evidence of Pat and Don was "established" or "[did] not need further support," especially where Judge Steadman very clearly indicated that he gave their evidence no credence or weight as to Lynch's having been drinking all during the day and concluding early in the evening just before he was arrested that day. [A.81-82, pars. 13-17; A.86, par. 14, last two sentences] The motion judge, in effect, treated pat's and Don's testimony as though they had not testified at all.

---

[29] *Lynch*, 789 N.E.2d 1058.

The SJC was also less than complete and accurate in either misconstruing the record, misstating the record, or selectively referring to the record.

First, it comments on the absence of affidavits from Kimberly and Dr. Kiley without acknowledging that undersigned counsel explained in his own affidavit under oath that: he spoke to them, obtained information from them, asked them each for and affidavit; that each stated her/his own reason for not supplying the affidavit; and that each indicated that she/he would testify if duly served with a subpoena [A. 286-291; S.A. 5, 7-8]. The SJC is also arbitrary and unfair, where here the SJC treats undersigned counsel's offer of proof in his affidavit as inadmissible hearsay, but then accepts for the truth that part of undersigned counsel's affidavit on what trial counsel told him about the struggle demonstration. *Lynch*, 789 N.E.2d 1057-1059.

Second, there is no record evidence that Kimberly's "last name, address and telephone number is apparently unknown."[30] The implication is that undersigned counsel does not know these things. Besides being irrelevant to whether trial counsel was ineffective (the *Strickland* issue at hand), the SJC ignores undersigned counsel's affidavit which states that "Kimberly returned my call" (from which the Court could reasonably infer that undersigned counsel knew her telephone number and used it to place the call that she returned), and

---

[30] *Lynch*, 789 N.E.2d 1057.

46

that she "currently lives in Stoughton, Massachusetts with her husband and two minor children [A. 286, par. 7, and sub par. (a)]."

Third, as defendant sought funds and leave to subpoena her and take her deposition so that she could provide sworn testimony in keeping with the information stated in undersigned counsel's affidavit, the Court could reasonably infer that undersigned counsel knows her last name and has kept track of her whereabouts.

Fourth, the SJC fails to list in its opinion (and, one would infer, fails to consider) Dr. Kiley's finding's in his written evaluation that Lynch's mood was "depressed," that there was "no lability" (i.e., no change) in his range of affect [A. 304].

Fifth, the Court engages in implicit fact-finding when it states that Dr. Kiley's "written evaluation ... belies the assertions in appellate counsel's affidavit."[31] That type of conclusion is for a trial court level fact-finder and not for an appellate court. Had appellant been allowed to take his deposition, Dr. Kiley would have been able to reconcile the findings in his written evaluation as being consistent with his statements to undersigned counsel: that he observed Lynch to be "hung over" and "in a great deal of discomfort from withdrawal of alcohol" when he observed him between 10:00A.M. and noon [A. 290-291], at least ten hours after the conclusion of the custodial interrogation. The SJC makes it a point to state that Dr. Kiley's evaluation "makes no mention of suspected alcohol

---

[31] *Lynch*, 789 N.E.2d 1057-1058.

47

withdrawal," *Lynch*, 789 N.E.2d 1058, but does not point out or recognize that Dr. Kiley's job at that time he made the evaluation was only to evaluate Lynch's competency to stand trial. Dr. Kiley wrote his observations regarding competency to stand trial in terms of "current[] suffering from a major mental illness [A.305]." It was not his job at the time to opine on the cause of observed "body tremors" and the other observations he noted on the form. Because of Dr. Kiley's experience in conducting evaluations and writing reports relating to petitions for commitment of alleged alcoholics or substance abusers to a facility [A.290, sub par. (e)], it is obvious that counsel would have asked him questions that explored the cause of Lynch's "body tremors," "depressed" mood, and "no lability" in range of affect [A. 290, sub par. (h); A.304]. Based upon his experience and upon the history he took, it is perfectly competent and reasonable for Dr. Kiley to state to undersigned counsel that Lynch appeared him to be "hung over ... and ... in a great deal of discomfort from withdrawal of alcohol [A.290, sub par (h)]."

Sixth, the SJC also ignores the corroborating evidence in the record contained in Lynch's Bridgewater State Hospital records. These records begin at a time later in the day of his arraignment [A.309-322]. See, for example: (1) summary of findings and impressions: "P.E. Acute Alcohol Withdrawal" ( dated 1/5/93" at 7:45 P.M.) [A.310]; (2) medical history, section on a statement of present health dated 1/5/93: "Good, except withdrawing from Alcohol" [A. 311]; (3) the same history record, in

a section on social history: "Last Drink = 24Hr.ago," from which one could reasonably infer the last drink on the day he was interrogated was in the 7:00P.M. to 8:00P.M. range; and (4) in the initial treatment plan dated 1/5/93, in the section on problems: "?ETOH [alcohol] withdrawal [A. 315]."

Seventh, the SJC ignores undersigned counsel's statement under oath that he reviewed Kimberly's and Dr. Kiley's expected new evidence with Dr. Lukes, and that Dr. Lukes found this new evidence to be a sound basis for his conclusions [A.202-293]. And, of course, petitioner asked the state court for funds to authenticate the hospital records and to depose Dr. Lukes [A. 333; S.A.8], neither of which the SJC mentioned in its opinion.

Eighth, the SJC takes the trouble to state in note fn.2 that "[i]t is significant that no affidavit from trial counsel was submitted in connection with Lynch's motion for new trial." This is a misleading and selective use of the record, because (1) undersigned counsel's affidavit explained that, "[n]either attorney Mitchell [lead counsel] nor attorney Rubin [co-counsel] would give me an affidavit regarding the things they told me on the telephone on the subjects covered in this paragraph 11 [A.297];" and (2) petitioner asked for funds to take their depositions [A.334; S.A. 13].

49

In misconstruing, misstating, and selectively using the record on this issue, the SJC again indicates an unfair bias toward the Commonwealth, and also engages in implicit fact-finding.

Ninth, the SJC unreasonably misapplied the *Strickland* standard. The thrust of *Strickland* speaks of evidence which raises a reasonable doubt, although not necessarily of such character as to create a substantial likelihood of acquittal. See discussion in *Woodford v. Visciotti*, ___ U.S.___, 123 S.Ct.357, 359 (2002).

Lastly, the SJC unreasonably downgraded Kimberly's testimony by concluding that it would have been cumulative. Paraphrasing *Williams v. Taylor*,

> the entire postconviction record[] [should be] viewed as a whole and <u>cumulative</u> of ... evidence presented originally, [as to whether] it raised a reasonable probability that the result of the ... proceeding would have been different if competent counsel had presented and explained the significance of all the available evidence. It follows that the [SJC] rendered a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law. [Lynch's] constitutional right to the effective assistance of counsel as defined in *Strickland* ... was violated.

*Williams v. Taylor, supra,* 529 U.S. 398-399 (emphasis supplied, quotation marks omitted). As to the allegedly unfavorable information in Dr. Kiley's report, *Williams* mandates acceptance of the reality that, even if "not all of the additional evidence was favorable," evidence which would have helped defendant should have been presented to the fact finder; and it does not accept a counsel's "tactical decision" in simply relying upon

what was available to him without further investigation as representation within an objective standard of reasonableness. *Id.* 529 U.S. at 396.

In short, on a fair view of the missing evidence, which could have been put to the test had petitioner's requests for funds been allowed, the custodial statements would have been suppressed, and the absence of Sgt. Loud's testimony on the custodial statements at trail would have changed jury's conclusion.

There should have been a remand by the SJC with an order allowing funds for the requested depositions and for an ensuing evidentiary hearing on this issue.

**Ground four**: Petitioner was deprived of effective assistance of counsel when his counsel failed to pre-test and rehearse the in-court reenactment, during which counsel used himself as a stand-in for the decedent, Geremia, so that it would not backfire on counsel or his client. The hoped-for purpose of reenactment was to have defendant show the jury how he struggled with Geremia. Defense counsel is at least a foot taller than Geremia, thus making it physically awkward for defendant to accurately demonstrate. This permitted the prosecutor to have the defendant make the same physically awkward demonstration using the prosecutor as a stand-in, thus permitting the prosecutor to remark adversely upon the physical awkwardness in closing argument for the purpose of diminishing defendant's credibility and his self-defense theory.

1. Trial counsel was ineffective in preparing for the struggle demonstration.

During Lynch's direct examination, his defense counsel had him participate in a demonstration, a reenactment. According to counsel, he had Lynch try to demonstrate how the struggle between the defendant and Geremia unfolded and their relative positions during the struggle [A. 296, par. 11(g)]. Defense counsel Mitchell is six feet tall, and yet he used

51

himself as a stand-in for the five foot tall Geremia in the reenactment with the six feet two inch defendant [6/175-176].[32] Counsel did not consider the height difference meaningful before attempting the reenactment. It did not occur to him to use someone else, even his female associate, Ms. Rubin, who is about five feet six inches tall. He thinks he rehearsed it with Lynch, but he is not absolutely sure. Attorney Rubin did not think the height difference to be important [A. 296, par. 11 (g)]. Lynch states that defense counsel did not rehearse the reenactment with him and did not tell him that he would be asked to reenact the struggle during his trial testimony using Attorney Mitchell as a stand-in for Geremia [A. 278, par. 5]. The reenactments were awkward and damaging to the defendant, as shown by the prosecutor's derisive remarks in his closing on the subject to diminish Lynch's credibility. [7/182-183].

2. <u>Defense counsel's conduct fell below professional norms for an in-court demonstration.</u>

Defense counsel's conduct violates two, long-standing principles: that one must not use a demonstration at trial that does not as closely as possible have the same conditions as in the original event and; that one

---

[32] The prosecutor, also six feet tall, made the defendant go through the same awkward demonstration, using himself in place of defense counsel [6/210].

must not try a demonstration at trial unless one is virtually certain that it will work.[33]

An accurate demonstration of how the struggle between the defendant and Geremia unfolded and their relative positions might have been helpful in raising reasonable doubt on the murder charge. The defendant's credibility was "on the line." The trial judge called the struggle "a complicated factual scenario [A. 379-380]," but he does not dispute the awkwardness and damaging effect of the reenactments. Such a "complicated factual scenario" required greater care that should have been taken by a "reasonably competent attorney" performing "within the range of competence demanded of attorneys in criminal cases." *United States v. Cronic, supra*, 466 U.S. 655. Such a lawyer would have done a pretest in order to avoid the harm in cross-examination and closing argument. Better work, by subjecting the reenactment to a pretested "dry run," might have accomplished something material for the defendant.

---

[33] See, e. g., Schweitzer, *Cyclopedia of Trial Practice*, sec. 227 (2nd ed., and 1997 supple.): "Counsel should weigh carefully the advisability of attempting use of demonstrative ... evidence before a jury. Unless he has fully satisfied himself that the use ... creates no undue prejudice, that conditions are not substantially dissimilar; ... he might be pursuing the wiser course to forego its use." See, also, *United States v. Skinner*, 425 F. 2d 552 (D. C. Cir. 1970), cited in BNA, *Criminal Practice Manual*, Sec. 101-1001[3] (1996) (demonstration by prosecutor to show angle of trajectory); *United States v. Chavis*, 476 F. 2d 1137, 1143 (D. C. Cir. 1973) (no lawyer should rely on a witness to simply "tell his story"); "these [in-court reenactments] should be pretested so that they will not backfire on counsel or his client," Carlsen, *Criminal Law Advocacy*, § 6.03 (b) [iii] (incl. 1997 supple.); "As with other witnesses, the defendant's testimony should be subjected to 'dry runs' to clear up any inconsistencies or omissions." Amsterdam, *Trial Manual for Defense of Criminal Cases*, 280 (1984).

53

Counsel's failure to appreciate the height dissimilarity, the resulting awkwardness, and undue prejudice caused thereby satisfies the *Strickland* test for ineffective assistance of counsel.

3.  <u>The SJC's discussion of the claim did not amount to a determination worthy of deference by a federal court, but if it was a determination, its analysis and determination is objectively unreasonable, and it contravenes, and constitutes an unreasonable application of U.S. Supreme Court precedent.</u>

(a) <u>The SJC's inappropriate approach to the facts</u>.

The SJC took an inappropriate and unbalanced approach to the facts. See *ante*, n. 15.

(b) <u>What the SJC unreasonably overlooks and misapprehends on the *Strickland* prongs</u>.

Contrary to its position that "the affidavit of appellate counsel as to what Dr. Kiley and Kimberly would have testified is inadmissible hearsay" [*Lynch*, 789 N.E.2d 1057], the position that the SJC takes here accepts for the truth that part of undersigned counsel's affidavit on what trial counsel told him about the struggle demonstration [*Id.* 1059]. Not only is that position arbitrary, it again indicates an unfair bias toward the Commonwealth, when the court uses the statements of trial counsel to help the Commonwealth but not to help the appellant.

In addition, the SJC in several respects misstates and mischaracterizes, what lead trial counsel and his co-counsel told appellate counsel, and also leaves out important events.

First, neither attorney Mitchell nor attorney Rubin told undersigned counsel "that the <u>reenactment was not hindered</u> by any height difference between trial counsel and Geremia." (*Id.*, emphasis supplied). The Court's characterization implies that trial counsel was appraising the way the demonstration actually "played" at trial. Rather, attorney Mitchell told undersigned counsel about his considerations before the "play went up," so to speak. Attorney Mitchell said "that he <u>did not consider</u> the height differences meaningful **before** he attempted the demonstration. It <u>did not occur to him</u> to use someone [shorter] [A.296; S.A. 73]." Attorney Rubin did "not recall the demonstration with any clarity. She thought [at the time she was speaking to undersigned counsel] that the ... height differences <u>did not seem important at the time</u> and that attorney Mitchell would not have done anything differently [A. 297; S.A. 74]."

Second, neither attorney Mitchell nor attorney Rubin told undersigned counsel that "the reenactment had probably been rehearsed [*Id.*]." Attorney Mitchell, rather, told undersigned counsel that, "[h]e <u>thinks</u> he rehearsed the demonstration with the defendant, but he is <u>not absolutely sure</u> [A. 296-297]." The trial was in February 1995; the date of undersigned counsel's affidavit is December 1997. The awkward demonstration at the end of the trial was followed by a second awkward demonstration held by the six-foot-tall prosecutor as a stand-in for decedent; and was later followed by the prosecutor's pointed and

55

devastating remarks about the demonstration — all of which stripped defendant of another part of his self-defense theory. Keeping that in mind, one could reasonably infer that trial counsel would have been absolutely sure, when he was talking to undersigned counsel, about whether he rehearsed the demonstration with the defendant.

Third, as to what actually occurred at trial, the court only sets forth the cold record of the demonstration on Lynch's direct examination. [*Lynch*, 789 N.E.2d. 1059, n. 3]. The court leaves out two very important events: the second awkward reenactment staged by the prosecutor on cross-examination, and the prosecutor's closing, where he argued:

> Self defense. Please. Did you see <u>the contortions</u> this defendant went through when he's trying to describe how he stabbed 6 foot Gaziano [the prosecutor] and 6 foot Mitchell and then he was reminded it was 5 foot Geremia? OOPS. I guess I didn't mean that.
> .....
> And then this big guy is allegedly incapacitated. <u>While his arms are all out in some contorted position</u> she's able to kick him in the groin during this life and death struggle. And he goes down. And poor Ed Lynch is incapacitated by Andrea Geremia, and she just runs into that knife

[7/182-183].

The above shows why the prosecutor did not object to the proposed demonstration in the first place. After examining the entire transcript, one could reasonably infer that the prosecutor had a very good grasp on the uses of evidence. Here, he could have objected to the demonstration on the grounds that the demonstration conditions, i. e., the one-foot height difference and commensurate weight difference between attorney

Mitchell and the petite decedent, were not sufficiently similar to the actual conditions to render the demonstration relevant. *Griffin v. General Motors*, 380 Mass. 362, 365-366, 403 N.E.2d 402 (1980); *Commonwealth v. Makarewicz*, 333 Mass. 575, 592-593, 132 N.E.2d 294 (1956). See, also, DB 39, n. 27 and accompanying text. The reason the prosecutor did not object was that he saw this as a "gift" from the defendant, and we see how powerfully he used it. One could reasonably infer that if trial counsel actually rehearsed the demonstration, he would have seen that he would be handing the Commonwealth a "gift."

As to the footnote, to the effect that it fails to see how it would have assisted the defendant to use a person similar to decedent's stature [*Lynch*, 789 N.E.2d 1059, n.4], the SJC ignores the following:

Aside from differences in height and weight, there is nothing in the trial evidence from which the jury can reasonably infer that Geremia was significantly weaker than defendant under the circumstances. But there was trial evidence from which the jury could draw reasonable inferences about her will to fight, will to protect herself from one of her "Johns," and her fighting and defensive skills. The trial judge instructed each juror to use his/her own common sense, general life experience, good reasoning and good judgment in deciding the facts [7/199,200, 205]. Using those "tools," a juror could reasonably infer that Geremia was a thirty year old woman in reasonably good health, that she supported herself in whole or in part by selling her sex for cash, that she made her living on the rough

side of life and would likely be able to take care of herself, that in this day and age women of all shapes and sizes would know that a swift knee to the groin would immobilize and disable a man, that a woman in her position would be willing to act on that knowledge, and that Geremia would do so to one of her "Johns" if necessary. On the other hand, there was evidence from which a juror could draw reasonable inferences that at the time of the struggle, the defendant would not have been as strong as his size might suggest, that defendant was over 10 years older than Geremia, that he had been an alcoholic since age 15, that he had been drinking heavily for about two straight days without much sleep or food, that he drank more in the cottage and passed out, that he then awoke, that he caught her in the act of stealing, that, knowing she was caught stealing, she would have had the determination to knee him in the groin right after he grabbed her knife-wielding arm and hand, that he went down on one knee as a result, that he would be further weakened, and that the knee to the groin served as an equalizer to any apparent disparity of strength. Still using common sense, a reasonable juror would appreciate from his/her own life experience that a person's size alone does not determine strength or fighting ability.

With a struggle demonstration using a person closer to Geremia's size as a stand-in for her, a juror might reasonably determine that the struggle, with defendant now down on one knee in weakened condition, would be between more equal actors, with defendant determined not to

58

get stabbed or cut by the knife, pushing Geremia back while holding her knife-wielding arm and hand while she was slapping him. The defendant's argument is that a juror would have been more likely, upon such evidence, and upon proper instruction, to find self-defense or manslaughter.

With the foregoing considerations in mind, the trial judge's "decision in this regard" [*id.*] is unreasonable and not entitled to any deference.

The SJC applied a "manifestly unreasonable" test to the trial counsel's <u>decision</u>, as it relates to <u>strategy</u>, to stage the reenactment. Firstly, the mere incantation of strategy does not insulate attorney behavior from review. *Fisher v. Gibson,* 282 F.3d 1283, 1296 (10th Cir.2002). The Court must consider whether that strategy was objectively reasonable. *Id.* at 1305; *Roe v. Flores-Ortega,* 528 U.S. 470, 481 (2000). Secondly, the SJC, for its part, also unreasonably viewed petitioner's argument. He was not claiming that trial counsel's "decision to stage a reenactment," [*Lynch,* 789 N.E.2d 1059], was ineffective. Petitioner claims, rather, that trial counsel's conduct in carrying-out his decision fell outside the "range of competence demanded of attorneys in criminal cases," *United States v. Cronic, supra,* 466 U.S. 655. See, *ante,* n. 33 and accompanying text.

Had the reenactment been conducted within the range of competence, there is a reasonable probability that the result of the proceeding would have been different.

59

### (c) The SJC's determination was unreasonable because the "manifestly unreasonable" test requires a fully informed counsel.

The "manifestly unreasonable" rubric used by the SJC can be traced to the idea applied to "trial strategy" and 'trial tactics" as first used in Massachusetts in *Commonwealth v. Adams* 374 Mass. 722, 375 N.E.2d 681 (1978).

> Although most cases involving a claim of ineffective counsel concern counsel's lack of preparation, there may be instances where the judgment of fully informed counsel may be so manifestly unreasonable as to be unprotected by the labels of 'trial strategy' or 'trial tactics.' "Defense strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent deny a criminal defendant the effective assistance of counsel, if some other action would have better protected a defendant and was reasonably foreseeable as such before trial." *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974).

*Id.* 374 Mass. 728-729, 375 N.E.2d 685.

This is similar to the concept derived from the following language in *Strickland*:

> At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. .... As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.